NONCONFIDENTIAL
No. 2014-1032

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
# 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

———————

BAYER CROPSCIENCE AG AND BAYER S.A.S.,

*Plaintiffs-Appellants,*

v.

DOW AGROSCIENCES LLC,

*Defendant-Appellee.*

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
DELAWARE IN CASE NO. 1:12-CV-256-RMB-JS, JUDGE RENÉE MARIE BUMB

———————

## ANSWERING BRIEF OF DEFENDANT-APPELLEE
## DOW AGROSCIENCES LLC

———————

Peter A. Bicks
Alex V. Chachkes
Andrew D. Silverman
ORRICK, HERRINGTON &
SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

Mark S. Davies
Susannah Landes Weaver
ORRICK, HERRINGTON &
SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Attorneys for Defendant-Appellee Dow AgroSciences LLC*

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellee certify the following:

1.     We represent Dow AgroSciences LLC.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented:  Dow AgroSciences LLC.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented:  Dow AgroSciences LLC is a wholly owned subsidiary of The Dow Chemical Company.

4.     The names of all law firms and the partners or associates that appeared for party or amicus now represented in trial court or agency or are expected to appear in this court are:

ORRICK, HERRINGTON & SUTCLIFFE LLP

Mark S. Davies
Peter A. Bicks
Robert L. Sills
James L. Stengel
Alex V. Chachkes
Elizabeth A. Howard
Hardip B. Passananti
Andrew D. Silverman
Daniel Habib
Susannah Landes Weaver

i

Joseph A. Sherinsky
Ross C. Paolino
Katherine M. Kopp
Ilene Albala

ASHBY & GEDDES, P.A.
Steven J. Balick
Lauren E. Maguire
Andrew C. Mayo

Date: March 20, 2014

Respectfully submitted,

/s/ Mark S. Davies
Mark S. Davies
*Attorney for Defendant-Appellee*
*Dow AgroSciences LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... vi

STATEMENT OF RELATED CASES ......................................................... x

INTRODUCTION ................................................................................... 1

STATEMENT OF ISSUES ....................................................................... 4

STATEMENT OF FACTS ........................................................................ 4

    Bayer Decides To Leave The Soybean Business ........................... 4

    Bayer Grants MS Tech An Exclusive License To Make, Have
    Made, Sell And Sublicense Glyphosate Tolerant Soybean ........... 6

    Bayer Grants Stine Seed A Nonexclusive License To Sell
    Glyphosate Tolerant Soybean Seeds ......................................... 10

    MS Tech And DAS Agree That DAS Will Make And Sell E3
    Soybean ...................................................................................... 12

    Bayer Sues And The District Court Grants DAS Summary
    Judgment .................................................................................... 14

STANDARD OF REVIEW ..................................................................... 18

SUMMARY OF THE ARGUMENT ......................................................... 19

ARGUMENT ........................................................................................ 23

I.    MS TECH IS LICENSED TO MAKE, HAVE MADE, AND
    SELL GLYPHOSATE TOLERANT SOYBEANS UNDER
    THE PLAIN LANGUAGE OF THE AGREEMENTS WITH
    BAYER ...................................................................................... 24

    A.    The District Court Correctly Held That The Plain
        Language Of Bayer's Agreements Grants MS Tech A
        License To Make, Have Made, And Sell Glyphosate
        Tolerant Soybeans ............................................................. 26

        1.    Article 3.1.2 of the Bayer-MS Tech Agreement
            and Article 2.2.1 of the Bayer-Stine Seed
            Agreement license MS Tech to make, have
            made, and sell glyphosate tolerant soybeans
            under Bayer's patents. ............................................. 26

  2. Other provisions confirm MS Tech's right to make, have made, and sell glyphosate tolerant soybeans under Bayer's patents. ..................................32

 B. The District Court Correctly Rejected Bayer's Readings Of The Agreements ..................................35

  1. The district court correctly rejected Bayer's theory that MS Tech's rights to market, offer, and sell were "carved out." ..................................35

  2. The district court correctly rejected Bayer's theory that MS Tech's license does not include "seeds." ..................................38

II. MS TECH IS LICENSED TO MAKE, HAVE MADE, AND SELL GLYPHOSATE TOLERANT SOYBEANS IN LIGHT OF THE AGREEMENTS' COMMERCIAL PURPOSE AND UNDISPUTED BACKGROUND FACTS ..................................43

 A. The Commercial Purpose Of The Agreements Is Undisputed And Confirms DAS's Interpretation ..................................45

  1. It is undisputed that Bayer decided to no longer make or sell glyphosate tolerant soybeans ..................................45

  2. It is undisputed that MS Tech planned to make and sell glyphosate tolerant soybeans. ..................................49

  3. It is undisputed that Stine Seed could only obtain a nonexclusive right to sell glyphosate tolerant seeds. ..................................50

 B. The District Court Correctly Rejected Bayer's "Inferences" Of Alternative Commercial Purposes ..................................51

  1. It makes no commercial sense that MS Tech purchased a license without the right to "market, offer, [and] sell" glyphosate tolerant soybeans ..................................51

  2. It makes no commercial sense that MS Tech purchased a license without the right to "make, [have made,] … market, offer, sell, … [and] use" glyphosate tolerant soybean seeds. ..................................54

C.       There Are No Disputed Background Facts Relevant To The Commercial Purpose Of The Agreements ...............57

        1.    Speculation about why Stine Seed paid more than MS Tech does not create a genuine dispute. ........................................................................57

        2.    It is undisputed that MS Tech and Stine Seed are not "affiliates.".......................................................59

III.   MS TECH LICENSED DAS TO MAKE AND SELL GLYPHOSATE TOLERANT SOYBEANS....................................61

    A.    DAS Made E3 For MS Tech And MS Tech Sublicensed DAS To Make And Sell E3................................62

    B.    Bayer Raises Eight Meritless Assertions Of Factual Disputes ...............................................................................67

CONCLUSION ........................................................................74

Material has been deleted from pages 4-7, 12, 25, 33, 36, 37, 39, 46-48, 50-52, 54, and 58-61 of the nonconfidential Answering Brief of Defendant-Appellee Dow AgroSciences LLC because the material is deemed confidential business information pursuant to the Protective Orders entered January 14, 2013 and October 28, 2013. The material omitted from these pages contains confidential deposition and hearing testimony, confidential business information, and confidential licensing information.

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abbott Labs. v. Diamedix Corp.*,
  47 F.3d 1128 (Fed. Cir. 1995) ............................................................29

*Acumed LLC v. Advanced Surgical Servs., Inc.*,
  561 F.3d 199 (3d Cir. 2009).................................................................57

*Air Safety, Inc. v. Teachers Realty Corp.*,
  706 N.E.2d 882 (Ill. 1999) ....................................................24, 63, 69

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................. 18, 19, 38, 46, 57

*Banco de Credito Indus., S.A. v. Tesoreria Gen.*,
  990 F.2d 827 (5th Cir. 1993) ...............................................................31

*Bayer CropScience AG v. Dow AgroSciences LLC*,
  728 F.3d 1324 (Fed. Cir. 2013) .........................................................1, 2

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,
  974 F.2d 1358 (3d Cir. 1992)...............................................................47

*Carborundum Co. v. Molten Metal Equip. Innovat'ns, Inc.*,
  72 F.3d 872 (Fed. Cir. 1995) ...............................................................24

*Conopco, Inc. v. United States*,
  572 F.3d 162 (3d Cir. 2009)............................................................3, 58

*CoreBrace LLC v. Star Seismic LLC*,
  566 F.3d 1069 (Fed. Cir. 2009) ..........................................................66

*Cyrix Corp. v. Intel Corp.*,
  77 F.3d 1381 (Fed. Cir. 1996) .............................................................31

*De Forest Radio Tel. & Tel. Co. v. United States*,
  273 U.S. 236 (1927) ...............................................................................2

*El v. Se. Pa. Transp. Auth. (SEPTA)*,
   479 F.3d 232 (3rd Cir. 2007) .................................................. 47

*Estate of Schneider v. Ralston*,
   127 N.E.2d 445 (Ill. 1955) .................................................... 63

*Ferrostaal, Inc. v. M/V Sea Phoenix*,
   447 F.3d 212 (2006) ............................................................. 18

*Ford v. Panasonic Corp. of N. Am.*,
   284 F. App'x 901 (3d Cir. 2008) ......................................... 31

*Gaiman v. McFarlane*,
   360 F.3d 644 (7th Cir. 2004) ............................................... 65

*Gonzalez v. Sec'y of Dep't of Homeland Sec.*,
   678 F.3d 254 (3d Cir. 2012) ................................................. 71

*J.C. Penney Life Ins. Co. v. Pilosi*,
   393 F.3d 356 (3d Cir. 2004) ................................................. 29

*Jackson v. Danberg*,
   594 F.3d 210 (3d Cir. 2010) ................................................... 3

*Jama v. Immig. & Customs Enf.*,
   543 U.S. 335 (2005) ............................................................. 28

*James v. Zurich-Am. Ins. Co. of Ill.*,
   203 F.3d 250 (3d Cir. 2000) ................................................. 64

*Mylan Inc. v. SmithKline Beecham Corp.*,
   723 F.3d 413 (3d Cir. 2013) ................................... 24, 29, 45

*Parklane Hosiery Co. v. Shore*,
   439 U.S. 322 (1979) ............................................................. 45

*Paton v. La Prade*,
   524 F.2d 862 (3d Cir. 1975) ................................................. 31

*Petersen Mfg. Co. v. Cent. Purchasing, Inc.*,
   740 F.2d 1541 (Fed. Cir. 1984) ........................................... 31

*Rainy Sky S.A. v. Kookmin Bank*
[2011] UKSC 50; [2011] 1 WLR 2900 (U.K.) .....................................43

*Regents of Univ. of N.M. v. Knight,*
321 F.3d 1111 (Fed. Cir. 2003) ........................................................70

*Rojas v. Attorney Gen.,*
728 F.3d 203 (3d Cir. 2013) .......................................................28, 29

*Shum v. Intel Corp.,*
633 F.3d 1067 (Fed. Cir. 2010) .......................................................18

*Silicon Graphics, Inc. v. ATI Techs., Inc.,*
607 F.3d 784 (Fed. Cir. 2010) ........................................................66

*SRI Int'l, Inc. v. Advanced Tech. Labs, Inc.,*
No. 93-1074, 1994 WL 712487
(Fed. Cir. Dec. 21, 1994) ................................................................31

*Stewart v. Cunningham,*
548 P.2d 740 (Kan. 1976) ...............................................................70

*Synopsys, Inc. v. Magma Design Automation, Inc.,*
No. C-04-3923, 2007 WL 322353
(N.D. Cal. Jan. 31, 2007) ................................................................70

*United States v. Hardwick,*
544 F.3d 565 (3d Cir. 2008) .......................................................30, 31

*United States v. Romero,*
293 F.3d 1120 (9th Cir. 2002) ........................................................63

*WiAV Solutions LLC v. Motorola, Inc.,*
631 F.3d 1257 (Fed. Cir. 2010) ......................................................29

## STATUTES, RULES AND REGULATIONS

7 C.F.R. § 340 .............................................................................55, 56

Fed. R. Civ. P. 56 ......................................................................18, 46

## OTHER AUTHORITIES

*American Heritage Dictionary*
    (William Morris ed. 1973) ..................................................................63

Claimant's Reply,
    *Bayer CropScience AG v. Dow AgroSciences LLC* ("*Bayer III*"),
    ICC No. 18892/VRO/AGF (ICC Arb. Feb. 27, 2014) ..........................31

Restatement (2d) Contracts (1981) ...........................................................64

*Webster's Third New International Dictionary*
    (Philip Babcock Gove et al. eds. 1993)..............................30, 62, 63, 64

10B Wright, Miller & Kane,
    *Federal Practice & Procedure: Civil 3d* (1998) ...................................31

## STATEMENT OF RELATED CASES

This appeal arises from the second of three lawsuits brought by Bayer CropScience A.G. and Bayer S.A.S. (collectively "Bayer") against Dow AgroSciences LLC ("DAS") regarding Enlist E3 Soybean ("E3 Soybean" or "E3"). E3 Soybean is a genetically modified soybean with traits that confer resistance or "tolerance" to three different herbicides that would otherwise damage or kill the soybean plants. Each Bayer suit addresses one of the herbicide tolerance traits in the E3 Soybean.

*Bayer I* included Bayer's claim of patent infringement based on the *aad-12* gene, a gene that provides tolerance to a widely used herbicide called 2,4-D. The district court (Bumb, J.) granted DAS summary judgment, and this Court recently affirmed. *Bayer CropScience AG v. Dow AgroSciences LLC,* 728 F.3d 1324, 1328-29 (Fed. Cir. 2013) (Prost, Bryson, Taranto, JJ.).

This case, *Bayer II*, began as a Bayer motion to amend its *Bayer I* complaint. The motion sought to add patent infringement claims based on E3's inclusion of the *dmmg* gene, a gene which provides tolerance to the herbicide glyphosate. After the motion to amend was briefed but before the district court heard argument, Bayer withdrew its motion

x

and filed the instant action.  The district court (Bumb, J.) again granted DAS summary judgment.  Bayer's statement of related cases omits mention of *Bayer I*.  *See* Bayer's Opening Brief ("BOB") at vii.

*Bayer III* involves E3's tolerance to the herbicide glufosinate. Although Bayer initially sued DAS in federal court in Virginia, that lawsuit is stayed while the matter is being pursued in arbitration.  *Int'l Chamber of Commerce Arb. No. 18892/VRO/AGF.*

**INTRODUCTION**

This case is about a new and innovative soybean—Enlist E3 Soybean—that, pending key regulatory approvals, DAS expects to bring to market by early 2016. E3 Soybean has a unique genetic composition making it tolerant to three different herbicides, and thus highly valuable to farmers. But while DAS foresaw the promise of such innovative soybeans to address the growing problem of hard-to-control weeds, Bayer did not. To the contrary, a decade ago Bayer decided to get out of the commercial corn and soybean business, licensing its technologies for others to bring to market. Now, regretting its decision, Bayer is attempting to take back in the courtroom what it gave up in the boardroom, filing three meritless lawsuits, each attacking a different tolerance trait in E3 Soybean.

In *Bayer I*, Bayer attacked the DAS innovation that provides plants with tolerance to the herbicide 2,4-D. Bayer lost that suit after it obtained a patent containing "claim language … known to be false," and this Court rejected Bayer's claim construction as divorced from "the scientifically accepted descriptive content of the term" and lacking

support in "[t]he patent and its history," "the intrinsic record," or "[t]he prosecution history." *Bayer*, 728 F.3d at 1328-29.

In *Bayer III*, Bayer attacks E3's tolerance to the herbicide glufosinate. Bayer's glufosinate claims are in arbitration before the ICC.

This is *Bayer II*. Bayer attacks E3's tolerance to the herbicide glyphosate. In 2004, Bayer decided to get out of the soybean market by, among other things, granting broad and exclusive licenses to MS Tech. One of these licenses permits MS Tech to have others develop and make glyphosate tolerant soybeans for MS Tech and also permits MS Tech to grant sublicenses so that others may sell glyphosate tolerant soybeans. In 2008, MS Tech decided to have DAS make the E3 Soybean for MS Tech by combining the respective herbicide tolerance technologies from each company into a single "three-gene molecular stacked event" that MS Tech then sublicensed DAS to sell. Accordingly, in making and preparing to sell E3 Soybean, DAS operates under a valid license, which—as the district court correctly concluded—is a complete defense to Bayer's infringement lawsuit. *See, e.g., De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 242 (1927).

In an effort to create genuine disputes of material fact where none exist otherwise, Bayer offers a confusing set of arguments that the district court considered and rejected. None of Bayer's arguments overcome the plain language of the agreements expressly authorizing DAS to make and sell E3 Soybean. And beyond the plain language, *all* of the evidence supports DAS.

Bayer also complains that the district court should have drawn several inferences in its favor. BOB 6-7, 26-29, 32-35, 46, 49, 59-60. Bayer's complaints are unpersuasive, however, because "inferences" must be "reasonable" and drawn "from the evidence." *Conopco, Inc. v. United States*, 572 F.3d 162, 165 (3d Cir. 2009). The inferences to which Bayer mistakenly believes it is entitled are "based on pure supposition" and therefore improper. *Jackson v. Danberg*, 594 F.3d 210, 226 (3d Cir. 2010). Bayer has nothing but "argument unsupported by the factual record [and] argument pertaining to a non-material matter." A19 n.10.

This Court should affirm.

Confidential
Material Omitted

## STATEMENT OF ISSUES

1.     Did the district court correctly conclude that Bayer granted

MS Tech a license to make and sell soybeans under the asserted

patents?

2.     Did the district court correctly conclude that MS Tech granted

DAS a license to make and sell soybeans under the asserted patents?

## STATEMENT OF FACTS

The facts set out below are undisputed.

## Bayer Decides To Leave The Soybean Business

In 2003, Bayer completed an extensive review of its "seed and

biotechnology" strategy, and decided to leave the U.S. corn and soybean

businesses.  A7223-30 (32:7-58:4); A7812-13 (160:14-162:15); *accord*

BOB 16.  As David Morgan, then one of Bayer's top executives, BOB 17,

explained:  Bayer recognized that while it ███████████████████████

████████████████████████████ A7223-24 (33:9-34:4), Bayer

had "patents and IP" "that could be incorporated into the soybean [and

corn] business."  A7227, 7245 (47:23-48:6, 118:23-119:16).  But Bayer

████████████████████████████████████████████████████████

████████████████████████████.  A7223-27, 7245 (47:23-48:6,

118:23-119:16, 33:22-35:23).  Instead, Bayer was "dependent upon

Confidential
Material Omitted

licensing … to third parties who owned soybean" and corn seeds.

A7223-27 (47:17-48:16, 33:22-35:23).

Unwilling to ████████████████████████████████

████████████████████████, A7224-27 (34:5-14,

49:4-16), Bayer decided that "the best thing to do" was to "monetize" its

assets and technologies, "liquidate the[ir] value" through "divestment,"

A11,408 (¶ 20); A7226-28 (43:5-14, 52:4-14), A12,169-71, and get out of

the "corn and soybean business," A7488 (11:24-12:6); A7287-88

(16:9-17:25).  Because Bayer's technologies could be used in plants

besides corn and soybeans, Bayer did not sell its patents.  Instead,

Bayer licensed the soybean and corn rights others would find valuable.

To carry out this "Divestment Project," A7232 (67:15-23), Bayer

organized a "divestment team," A7580 (9:18-22), led by Morgan.

A7222-26 (26:16-23, 43:2-24).

In late 2003, Morgan contacted Harry Stine, an officer of Stine

Seed Farm, Inc. ("Stine Seed").  A7285-87 (7:13-16, 15:3-16:11); A7234

(74:16-76:16).  Morgan knew that Stine had "a strong reputation for

breeding soybean seeds" and that if he "acquired the Bayer traits, he

could put those into his seeds, and … develop business" for his

Confidential
Material Omitted

companies and licensees.  A7230-34 (60:15-61:6, 74:16-76:16).  On

May 28, 2004, Bayer, MS Tech, and Stine Seed executed a deal

spanning 14 agreements.  A7489 (14:2-13); A7580 (6:19-25).

Two of the agreements—the "Bayer-MS Tech Agreement,"

A7395-7429, and the "Bayer-Stine Seed Agreement," A7927-90—involve

the "*dmmg*" gene and related technologies that confer tolerance to the

glyphosate herbicide.  Under the agreements, Bayer received

$5.6 million.  A7407 (¶ 4.1) ($1 million from MS Tech); A7934 (¶ 3.1)

($4.6 million from Stine Seed).

English law governs both agreements.  A7414 (¶ 12.1); A7940

(¶ 10.1).

## Bayer Grants MS Tech An Exclusive License To Make, Have Made, Sell And Sublicense Glyphosate Tolerant Soybean

Initially, Stine Seed was to acquire rights only in corn while

another affiliated company, ████████, would acquire rights regarding

soybean.  A10,934-39; A7290 (27:6-18).  As relevant, ████████ would

receive "an *exclusive license* to Bayer's [glyphosate tolerant] PATENTS

in Soybean." A10,936 (¶¶ 2.A.-B).

Later, ████████ was replaced by MS Tech.  A7695; A7290

(27:24-28:12).  MS Tech was created around that time to "get into

6

Confidential
Material Omitted

breeding and marketing of soybean seeds." A7494 (34:2-19).  As with

███████, MS Tech would obtain an "[e]xclusive license under [the

glyphosate tolerant] patents" in soybeans.  A7995; *accord* A7290

(26:9-28:12); A7632 (35:13-37:12); A7493 (30:12-32:8).

The Bayer-MS Tech Agreement begins:  "[Bayer] has decided to

divest the Asset and to grant licenses to certain of [its] Patents,

Information, Licensed Rights and Licensed Tools … in the field of

Glyphosate Tolerant Soybeans."  A7397 (first recital) (capitalization

altered).  A sixth recital states:  "[S]ome rights regarding the Asset will

be granted to Stine [Seed] and will hence be carved out from this

Agreement."  A7398 (capitalization altered).

Article 3.1.2, the key provision, provides:

[Bayer] hereby grants to [MS Tech] solely with regard to
SOYBEAN a worldwide, fully paid-up, exclusive license—
with the right to grant sublicenses solely as set out in
Article 3.1.3 and with the exception of the rights to increase,
market, distribute for sale, sell and offer for sale, granted to
STINE [SEED] by separate agreement—under the
LICENSED PATENTS in the field of GLYPHOSATE
TOLERANT SOYBEAN solely to EXPLOIT GLYPHOSATE
TOLERANCE GENES in M.S. SOYBEAN EVENTS.

A7403 (¶ 3.1.2).[1]

The Article 3.1.2 language is detailed and clear:

- The "Licensed Patents" are the patents Bayer asserts here.[2] BOB 11 n.3; A10,416 (Bayer MSJ Opp.); A7791 (74:8-17).

- The license is "exclusive" "except[]" for certain rights granted to Stine Seed by "separate agreement." A7403 (¶ 3.1.2).

- The license includes certain "Glyphosate Tolerance Genes," i.e., genes, such as the *dmmg* gene, which "confer tolerance" "in Soybean" to "glyphosate." A7399 (¶ 1.1.).

- The license includes "M.S. Soybean Events," defined as "Glyphosate Tolerance Genes" that are made "by or for" MS Tech. A7401 (¶ 1.1). "Events" refers to either genetically modified DNA or to seeds or plants that include the modified DNA. A4; A7581 (12:17-22).

- The license grants MS Tech the right to "Exploit," i.e., "to make, breed, produce, condition, market, offer, sell, import, export, stock, use, or otherwise dispose of (or offer to do or have done any or all of the foregoing)." A7399 (¶ 1.1).

--------

[1] Defined terms are capitalized. A7397 (¶ 1.1). For readability, this brief capitalizes only the first letters of the defined terms.

[2] The Licensed Patents are: "Histone Promoter Patents ['930 and '396], the Histone Intron Patents ['961], the Histone Terminator Patents ['282], the OTP Patents [RE '287 and RE '449], [and] the Dmmg Patents ['587]." A7400 (¶ 1.1). Though Bayer dropped the '961 patent, A12,795, it nevertheless cites all seven patents to this Court, BOB 11 n.3.

Thus, Bayer licensed MS Tech under the asserted patents to make, have made, and sell soybeans with new and innovative genetic modifications (i.e., "M.S. Soybean Events"). This enterprise would require MS Tech to invest "[t]ens of millions of dollars" in developing the M.S. Soybean Events before MS Tech could sell them. A7288, 7295 (19:6-25, 46:20-47:19); A7490-91 (21:7-24:3).

Article 3.1.1 has identical language to Article 3.1.2 except that Article 3.1.1 grants MS Tech a license for "Bayer Soybean Events" rather than "M.S. Soybean Events." A7403. "Bayer Soybean Events" are eight specified soybean events that were already made by Bayer and are tolerant to glyphosate. A7398, 7424 (¶ 1.1, Ex. 1.1.6).

For both Bayer Soybean Events and M.S. Soybean Events, Article 3.1.3 grants MS Tech sublicensing rights as broad as MS Tech's own exploitation rights, A7822 (200:10-16); A7612 (216:19-217:4):

> The license described in Article 3.1.1. [Bayer Soybean Events] and Article 3.1.2 [M.S. Soybean Events] shall include the right to sublicense the Bayer Soybean Events and the M.S. Soybean Events, excluding however any right to grant bare sublicenses to any of the Licensed Patents or … the Glyphosate Tolerance Genes.

A7403 (¶ 3.1.3). "Bare sublicenses," the parties agree, are sublicenses to the patents that are not "linked to an MS Soybean Event or a Bayer Soybean Event." A7812 (158:17-159:11).

Through the agreement, MS Tech also purchased soybean "Asset[s]," including "Bayer Soybean Events," "Legal Assets" (select third-party soybean agreements) and "Material" ("Soybean biological material containing the Bayer Soybean Events"). A7398-402 (¶¶ 1.1, 2.1).

## Bayer Grants Stine Seed A Nonexclusive License To Sell Glyphosate Tolerant Soybean Seeds

As quoted above, Articles 3.1.1 and 3.1.2 of the Bayer-MS Tech Agreement reference the rights "granted to Stine [Seed] by separate agreement." The key provision of the "separate" Bayer-Stine Seed Agreement, Article 2.2.1, provides:

> [Bayer] hereby grants to [Stine Seed] a worldwide, fully paid-up, ***non-exclusive license***—without the right to grant sublicenses—under the Licensed Patents … solely to increase, market, distribute for sale, sell and offer for sale Soybean seeds containing the Bayer Soybean Events and/or the M.S. Soybean Events ….

A7933 (emphasis added).

Because "[Bayer] ha[d] entered into a license agreement with

M.S. [Tech] pertaining to the subject matter of this license," MS Tech

joined Bayer and Stine Seed in signing this agreement.  A7933 (¶ 2.1.3).

Since it was divesting, it was immaterial to Bayer how MS Tech

and Stine Seed allocated rights.  A7594 (97:7-24); A7659

(143:25-145:19); A7498 (51:10-52:3).  The allocation was, however,

significant to MS Tech and Stine Seed.  Indeed, MS Tech and Stine

Seed first proposed granting some nonexclusive rights to Stine Seed.

A7495-500 (41:22-43:3; 57:12-58:10); A7692-93; A11,409 (¶ 23).

Granting Stine Seed a "non-exclusive" license to sell soybean seeds did

not impede MS Tech's plans to "make money" by developing innovative

soybean DNA and then selling both advanced seeds containing the DNA

and "out-licens[ing the innovative DNA] to the various seed distributing

companies."  A7290-94 (27:24-28:12, 30:3-31:10, 34:2-19); A7494 (34:2-

19).  And granting Stine Seed a "non-exclusive" license to sell only the

innovative seeds allowed Stine Seed to profit without triggering any

contractual obligations to Monsanto that might arise if Stine Seed

received "broad rights" to develop "trait[s] [i.e., the innovative DNA] in

11

Confidential
Material Omitted

soybeans." A7639-40 (65:24-67:4); A7516 (125:14-128:19); A7498-500 (52:18-58:10).

Once the deals closed, Morgan (Bayer's business leader for its divestment) sent Mr. Stine and an attorney on the deal, Joe Saluri, a "congratulat[ory]" email: "We wish you every success in capturing the intrinsic value that the assets promise. We were disappointed that Bayer was unable to convert that potential ███████████████████ █████████, but we are convinced that in your capable hands these 'products' will find their true worth in the market." A7620. Morgan later explained he was offering his "best wishes" that MS Tech and Stine Seed would "exploit the potential of these products in the market through their own endeavors." A7224-26 (35:24-40:12).

## MS Tech And DAS Agree That DAS Will Make And Sell E3 Soybean

DAS is a top-tier agricultural company that provides innovative agricultural solutions on a global scale. DAS's research increases yields for farmers worldwide through improved genetics and trait offerings that protect crops from insects, weeds, and herbicides. *See* A161.

E3 Soybean is expected to be one of DAS's flagship products. E3 marks the first time that three herbicide-tolerance genes are stacked as

part of a single soybean genetic event: (i) the *aad-12* gene for 2,4-D tolerance; (ii) the *dmmg* gene for glyphosate tolerance; and (iii) the *pat* gene for glufosinate tolerance. A7327 (175:6-177:22). This "stack," A4, of herbicide tolerance "traits" will permit farmers to apply all three herbicides without damaging the soybeans. A7305 (88:7-89:16).

DAS and MS Tech developed E3 together.

Specifically, a 2008 MS Tech-DAS Agreement ("MS Tech-DAS Agreement") establishes the legal framework for this collaboration. DAS granted MS Tech "a nonexclusive, nontransferable license" to DAS's intellectual property "for the purposes of development of the Dmmg/Aad12 Molecular Stack [i.e., E3 Soybean]." A11,053 (§ 4.2); *see* A7647 (95:21-96:4). And DAS received from MS Tech a "nonexclusive, nontransferable license … for purposes of the development of the Dmmg/Aad12 Molecular Stack where DAS may perform certain activities on behalf of MS Tech for the purposes of development of the Dmmg/Aad12 Molecular Stack." A11,052 (§ 4.1).

The agreement also provides that the Dmmg/Aad12 Molecular Stack is an "Authorized Event" that can be sold as a "Product" by DAS: "MS Tech shall enter into mutually acceptable, non-exclusive

13

agreements granting DAS licenses … to … Exploit such Authorized Event or Authorized Stack in Soybean ….” A11,054 (§ 4.5). The agreement specifies the details of the parties' collaboration, such as the commercial terms governing sales. A11,055-59 (§ 5). In 2011, DAS and MS Tech amended the agreement to more explicitly set forth DAS's prospective commercial rights to E3. A8530-32 (¶ 7).

The agreement is “governed by … Illinois” law. A11,084 (¶ 14.6).

## Bayer Sues And The District Court Grants DAS Summary Judgment

In August 2011, DAS and MS Tech announced a “collaborative submission” seeking USDA approval of E3 Soybean. A161. Three days later, Bayer sought to amend its complaint in *Bayer I* to add the patent infringement claims now at issue in this case. Before the motion could be decided, Bayer withdrew and filed the infringement claims in this separate suit. *See* A3888-90.

DAS responded principally by invoking its license from MS Tech. A627. The district court ordered expedited discovery and “[e]arly adjudication” of DAS's “license defense.” A759; A701-06. Following a two-day hearing, the court granted summary judgment to DAS. A1-29.

The district court began its analysis by observing that the "parties agree that, if D[AS] is operating under a valid sublicense, then D[AS] is entitled to summary judgment." A11. Bayer raised two questions about DAS's defense: Did MS Tech have a license to sell under the asserted patents, and, if so, did MS Tech grant DAS a sublicense to sell? To both questions, the district court answered yes. Relying on the agreement's plain language and the undisputed facts, the court held: (1) "MS Tech [has] the right to commercialize" glyphosate tolerant soybean seeds, and (2) "MS Tech appropriately sublicensed that right to D[AS]." A11.

The court observed that "the parties agree that English law" governs MS Tech and Stine Seed's agreements with Bayer and explained that it "could resolve an issue of English contractual interpretation as a matter of law, so long as there were no disputed [material] facts." A14. Applying this approach, the court concluded that Article 3.1.2 "is subject to only one reasonable interpretation," and "there are no *material* facts in dispute within the relevant 'factual matrix.'" A17 & n.6 (emphasis added). The "one reasonable interpretation" is that "the Agreement grants MS Tech the right to [among other things] commercialize" soybeans under the asserted

15

patents.  A11, 17 n.6, 20-25.  This is the only construction "consistent with the plain and ordinary language of Article 3.1.2," "the full context of the Agreement," and the grant of "non-exclusive" "commercialization rights" to Stine Seed.  A21-22.  In contrast, the district court rejected Bayer's contract interpretations as "inconsistent with" and "contrary to" the agreements.  A21-23.  Accordingly, the court concluded, there was no "ambiguity" in MS Tech's license to make, have made, use and sell glyphosate tolerant soybeans.  A24-25.

In addition, the court considered the "background knowledge which would reasonably have been available to the parties … at the time of the contract."  A12-13.  Under this "factual matrix," English law considers "anything which a reasonable man would have regarded as relevant" in ascertaining "what the contract would convey to a reasonable person," except "evidence of [the parties'] subsequent [post-contract] conduct, evidence as to the subjective intent of the parties[,] [and] evidence of [the parties'] pre-contractual negotiations," unless that otherwise excluded evidence goes to "the 'genesis' of the transaction."  A12-13.  As to the background facts, the court found the "*material* facts" "*undisputed*."  A7, 17 & n.7.  Indeed, having "pored over the record

searching for objective evidence to support [Bayer's] arguments … [and] f[i]nd[ing] none," the court rejected Bayer's theories as "unsupported" lawyer "argument[s]." A18-19 & n.10.  Finding "D[AS]'s construction … consistent with the factual matrix and the [agreement's] business purpose," the district court concluded that the "only … reasonable interpretation" is that MS Tech has a license to make, have made, use, and sell glyphosate tolerant soybeans under the asserted patents. A17 n.6, 23-25.

Next, the district court held that MS Tech "[a]ppropriately [s]ublicensed" its rights to DAS.  A25.  Recognizing that under the Bayer-MS Tech Agreement, MS Tech could sublicense its right to "Exploit" "M.S. Soybean Event[s]," i.e. events "made … for" MS Tech, the district court concluded that, in the MS Tech-DAS Agreement, DAS agreed to make E3 "for" MS Tech.  A25-26.  That agreement specifies that "MS Tech granted [DAS] a license to E3 'for purposes of development' 'on behalf of MS Tech.'"  A27.  DAS's development of E3 fell within the "plain meaning of 'for'" because it "inure[d] to the benefit of MS Tech."  A28.

In addition, "[t]o the extent this is purely a factual issue," the court found, "the record evidence is undisputed that ownership [of E3] by MS Tech is sufficient to demonstrate that E3 was made 'for' MS Tech" and that "[t]here is no dispute that MS Tech owns E3." A25-26.  Because E3 was made "for" MS Tech, MS Tech properly sublicensed exploitation rights to DAS.

Bayer appeals.

## STANDARD OF REVIEW

"[T]he law of the regional circuit" governs this Court's "review [of] grants of summary judgment … not unique to patent law." *Shum v. Intel Corp.*, 633 F.3d 1067, 1076 (Fed. Cir. 2010).  In the Third Circuit, "grant[s] of summary judgment" are reviewed "de novo." *Ferrostaal, Inc. v. M/V Sea Phoenix*, 447 F.3d 212, 216 (2006).

Summary judgment "shall" be granted if the "materials in the record" show "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a), (c)(1)(A).  Thus, "the mere existence of *some* alleged factual dispute … will not defeat … summary judgment; the requirement is that there be no *genuine* [dispute] of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis

added).  A "genuine [dispute]" requires the nonmovant to adduce "sufficient evidence" in its "favor[] … for a jury to return a verdict for that party."  *Id.* at 249.  A fact is "material" only when that fact could "affect the outcome of the suit."  *Id.* at 248-49.

## SUMMARY OF THE ARGUMENT

The district court correctly held that the undisputed facts establish that MS Tech obtained from Bayer a license to make, have made, and sell glyphosate tolerant soybeans.  The district court also correctly held that the undisputed facts establish MS Tech licensed DAS to make and sell glyphosate tolerant soybeans.  Because there is no genuine dispute that DAS is licensed under the patents asserted by Bayer, the district court correctly granted DAS summary judgment.

**I.**  The plain language of the relevant agreements establishes that MS Tech obtained from Bayer a license to make, have made, and sell glyphosate tolerant soybeans.  Article 3.1.2 of the Bayer-MS Tech Agreement grants to MS Tech "a worldwide, fully paid-up, exclusive license" to "Exploit Glyphosate Tolerance Genes in M.S. Soybean Events."  A7403.  The key term, "Exploit," is "very broad and all encompassing," and includes the right "to make," "have [made]," and

"sell" glyphosate tolerant soybeans.  A7399 (¶1.1).  Article 3.1.2 also contains an exception clause:  "exclusive license— … with the exception of the rights to increase, market, distribute for sale, sell and offer for sale, granted to Stine [Seed] by separate agreement."  A7403.  The "exception clause" is narrow because, in Article 2.2.1 of the separate agreement, Bayer granted Stine Seed a "***non-exclusive license***— without the right to grant sublicenses—under the Licensed Patents." A7933 (emphasis added).  Because Stine Seed's commercial rights are ***nonexclusive***, the "only … reasonable interpretation" of Article 3.1.2, A17 n.6, is that MS Tech obtained a license to make, have made, and sell glyphosate tolerant soybeans under Bayer's patents and the only exception to MS Tech's exclusivity is the nonexclusive license to Stine Seed, A22-23.

Although the plain textual reading set out above suffices to resolve this case, additional provisions in the Bayer-MS Tech Agreement confirm that Bayer licensed MS Tech to make, have made, and sell glyphosate tolerant soybeans.  Bayer's alternative readings of the agreements are not supported by the relevant text.

**II.** The undisputed background facts and the agreements' commercial purpose confirm that MS Tech obtained from Bayer a license to make, have made, and sell glyphosate tolerant soybeans. Bayer decided to no longer make or sell glyphosate tolerant soybeans; MS Tech planned to make, have made or sell glyphosate tolerant soybeans; and Stine Seed wanted only a nonexclusive right to sell glyphosate tolerant seeds. All of these commercial purposes are achieved by Bayer granting to MS Tech a license to make, have made, and sell glyphosate tolerant seeds.

Bayer's alternative theories require this Court to find credible that (1) Bayer retained valuable commercial rights despite its goal to get out of the soybean business and did so at the request of MS Tech and Stine Seed even though it was their goal to obtain valuable commercial rights; (2) MS Tech paid a million dollars to develop only soybean DNA, but not seed it could sell or on which it could obtain regulatory approval; (3) MS Tech and Stine Seed requested that the deal be structured so MS Tech could not sublicense to anyone but Stine Seed and Bayer; and (4) Stine Seed's "limited" "non-exclusive" commercial rights replaced MS Tech's exclusive rights to exploit the

21

innovative soybean.  None of this is plausible on the undisputed record. The district court correctly rejected Bayer's "inferences" of alternative commercial purposes.

**III.**  The undisputed facts establish that MS Tech granted DAS a license to make and sell glyphosate tolerant soybeans.  E3 is an M.S. Soybean Event as that term is defined in the Bayer-MS Tech Agreement.  Under that agreement, "M.S. Soybean Event" is a "Soybean transformation event[] comprising Glyphosate Tolerance Genes *made by or for* [MS Tech]."  A7401 (¶ 1.1) (emphasis added).  In the MS Tech-DAS Agreement, MS Tech agreed that "DAS may perform certain activities *on behalf of* MS Tech for the purposes of the development of [E3]," A11,052 (§ 4.1) (emphasis added), and, in partial exchange for the development, MS Tech licensed DAS to make and sell E3.  A11,052 (¶ 4.1); A11,054 (¶ 4.5).  The MS Tech-DAS Agreement's plain language demonstrates that by agreeing to make E3 "on behalf of" MS Tech, DAS made E3 "*for*" MS Tech.  All the parties to the MS Tech-DAS Agreement agree that MS Tech made E3 "for" DAS.  Indeed, the district court noted that "[t]here is no dispute that MS Tech owns E3." A25-26.

Bayer's eight attempts to show a genuine factual dispute concerning the MS Tech-DAS Agreement all fail. The relevant facts are not disputed.

## ARGUMENT

This case involves the meaning of certain terms in the agreements among Bayer, MS Tech and Stine Seed, and in the agreement between MS Tech and DAS. English law governs interpretation of the agreements among Bayer, MS Tech, and Stine Seed. A7414 (¶ 12.1); A7940 (¶ 10.1). Illinois law governs the agreement between MS Tech and DAS. A11,084 (¶ 14.6).

Although the difference in the source of substantive law renders the method of contract interpretation distinct, the inquiries are substantively harmonious. Under English law, as in some American jurisdictions, courts consider the contract's plain language in the context of "what the contract" means "to a reasonable person" with "all the background knowledge … reasonably … available to the parties" when the contract was executed (what English courts call the "factual matrix"). A13; *accord* A7999-8031 (Peel Decl.) (¶¶ 8.1, 11-13); A12,251-63 (Peel Sec. Decl.); A10,095-126 (Collins Decl.) (¶¶ 13, 22-23,

30); A11,259-89 (Collins Sec. Decl.) (¶¶ 27-30);[3] *see, e.g.*, *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 419 (3d Cir. 2013) (New Jersey law). Under Illinois law, as in other American jurisdictions, "[i]f the language of the contract is facially unambiguous, then the contract is interpreted … as a matter of law without the use of parol evidence." *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999). Nevertheless, in both English and American jurisdictions, when a contract is "clear and can't be interpreted in any other way," that "is the end" of the analysis. A12,420 (155:2-22); *accord* A8007 (¶ 15); A10,100-01 (¶ 18); A11,266 (¶ 26). Here, there is no dispute that if DAS is acting pursuant to a license, its license "is a defense to patent infringement." *Carborundum Co. v. Molten Metal Equip. Innovat'ns, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995).

## I. MS TECH IS LICENSED TO MAKE, HAVE MADE, AND SELL GLYPHOSATE TOLERANT SOYBEANS UNDER THE PLAIN LANGUAGE OF THE AGREEMENTS WITH BAYER

The plain language of Bayer's agreements with MS Tech and Stine Seed grants MS Tech a license to make, have made, and sell

---

[3] Professor Peel (for DAS) and Lord Collins (for Bayer) testified as experts on English law.

Confidential
Material Omitted

glyphosate tolerant soybeans under the asserted patents. Article 3.1.2's

plain language—including the definition of "Exploit," the "non-exclusive"

nature of Stine Seed's rights, and Article 3.1.2's structure—

unambiguously grants MS Tech a license to make, have made, and sell

glyphosate tolerant soybeans. § I.A.1. This plain reading is confirmed

by the sublicensing rights in Article 3.1.3 and the commercial rights in

the ███████ patent. § I.A.2.

Bayer's alternative readings of Article 3.1.2 do not square with the

text of Article 3.1.2 or the rest of MS Tech and Stine Seed's agreements

with Bayer. Bayer proposes that MS Tech is licensed to make and have

made glyphosate tolerant soybeans but not to sell them. By reading the

provision as though the nonexclusive license to Stine Seed limits

MS Tech's "exclusive license" to sell, Bayer's interpretation contorts

Article 3.1.2 in a way inconsistent with its text. So too, reading out of

the agreement any commercial rights for MS Tech contradicts

numerous other provisions that explicitly provide the right to MS Tech

to "sell" glyphosate tolerant soybeans. A7399-404, 7426-28 (¶¶ 1.1

("Exploit"), 3.1.5, Ex. 3.1.5). § I.B.1.

Bayer also suggests that MS Tech can make and sell unique and innovative soybean DNA but not seeds containing the DNA. This theory is inconsistent with various provisions which permit MS Tech to make, use, and sell soybean "seeds." A7399-404, 7426-28 (¶¶ 1.1 ("Exploit"), 3.1.5, 9.1.2, 11.3, Ex. 3.1.5). Moreover, Bayer's narrow definition of "event" as excluding "seeds" is disproven by Bayer's own witnesses and regulatory filings and rejected by its own expert. § I.B.2.

**A.  The District Court Correctly Held That The Plain Language Of Bayer's Agreements Grants MS Tech A License To Make, Have Made, And Sell Glyphosate Tolerant Soybeans**

As in American law, English contract interpretation begins first and foremost with the agreement's words: "Where the parties have used unambiguous language, the court must apply it." A8007 (¶ 15). Here, the district court properly granted summary judgment based on the language of Bayer's agreements with MS Tech and Stine Seed.

**1.  Article 3.1.2 of the Bayer-MS Tech Agreement and Article 2.2.1 of the Bayer-Stine Seed Agreement license MS Tech to make, have made, and sell glyphosate tolerant soybeans under Bayer's patents.**

This contract dispute is easily resolved by the plain language of the relevant provisions. Article 3.1.2 of the Bayer-MS Tech Agreement

26

> grants to [MS Tech] solely with regard to Soybean a
> worldwide, fully paid-up, ***exclusive license***—with the right
> to grant sublicenses solely as set out in Article 3.1.3 and
> with the exception of the rights to increase, market,
> distribute for sale, sell and offer for sale, granted to Stine
> [Seed] by separate agreement—under the Licensed Patents
> in the field of Glyphosate Tolerant Soybean solely to ***Exploit***
> Glyphosate Tolerance Genes in M.S. Soybean Events.

A7403 (emphasis added).

The key term, "Exploit," includes: "to make, breed, produce, condition, market, offer, sell, import, export, stock, use, or otherwise dispose of (or offer to do or have done any or all of the foregoing)." A7399 (¶ 1.1). "Exploit" is "very broad and all encompassing." A7242 (107:12-22); A12,466 (201:7-12) (Bayer's expert). Thus, under Article 3.1.2, MS Tech is licensed under the asserted patents "to make" and "sell" glyphosate tolerant soybeans.

Article 3.1.2 also contains an "exception": "an exclusive license— … with the exception of the rights to increase, market, distribute for sale, sell and offer for sale, granted to Stine [Seed] by ***separate agreement***—…." A7403 (emphasis added). There is no dispute that the reference to "separate agreement" is the Bayer-Stine Seed Agreement. In Article 2.1.1 of that agreement, Bayer granted "[Stine Seed] a worldwide, fully paid-up, ***non-exclusive license***—without the

right to grant sublicenses—under the Licensed Patents." A7933 (emphasis added).

Reading Article 3.1.2 of the Bayer-MS Tech Agreement with Article 2.1.1 of the Bayer-Stine Seed Agreement, Bayer granted MS Tech an "***exclusive license***" to make, have made, and sell glyphosate tolerant soybeans with the "exception of" the "***non-exclusive license***" to Stine Seed to also sell glyphosate tolerant soybeans. Because Stine Seed's commercial rights are ***nonexclusive***, the "only … reasonable interpretation" of Article 3.1.2, A17 n.6, is that MS Tech obtained a license to make, have made, and sell glyphosate tolerant soybeans under Bayer's patents, and the only exception to MS Tech's *exclusivity* is Stine Seed's ***nonexclusive*** license, A22-23.

This plain reading is confirmed by Article 3.1.2's structure and syntax. The "exception" clause "naturally modifies" the immediately preceding grant of an "exclusive license." A21 (exception modifies "exclusivity"); *see Jama v. Immig. & Customs Enf.*, 543 U.S. 335, 343 (2005) ("'A limiting clause or phrase … should ordinarily be read as modifying only the noun or phrase that it immediately follows'") (quoting *Barnhart v. Thomas,* 540 U.S. 20, 26 (2003)); *Rojas v. Attorney*

*Gen.,* 728 F.3d 203, 209 (3d Cir. 2013) (en banc) (finding it "clear that

the parenthetical … is a restrictive modifier that affects only its

immediate antecedent term"); *J.C. Penney Life Ins. Co. v. Pilosi*, 393

F.3d 356, 365 (3d Cir. 2004) ("[Q]ualifying words, phrases, and clauses

are to be applied to the words or phrase immediately preceding"

(quotation marks omitted)).

Bayer argues this simple reading is "inconsistent" with "the word

'exclusive'" in Article 3.1.2.  BOB 42.  Bayer's argument ignores,

however, the practical reality that contracts routinely grant "exclusive

rights" subject to other nonexclusive licenses.  *See*, *e.g.*, *Mylan Inc.*, 723

F.3d at 416-17 ("exclusive" patent license subject to "nonexclusive

licenses" to others); *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d

1257, 1267 (Fed. Cir. 2010) (licensee does not lose exclusivity "merely

because its license is subject not only to rights in existence at the time

of the license but also to future licenses that may be granted"); *Abbott

Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1129 (Fed. Cir. 1995) (license is

"exclusive" even when granted subject to eight nonexclusive licenses).[4]

---

[4] Bayer argues that DAS interpreted Article 3.1.2 "different[ly]" in opposition to Bayer's motion to amend in *Bayer I*.  BOB 25, 44 (quoting

Bayer also contends that "Exploit" does not contain a right to sell, pointing out that Exploit's definition does not contain the term "increase." BOB 23, 40. "[I]ncrease," Bayer says, "means to multiply seeds to [commercial] levels." *Id.* But "Exploit" includes the right "to make, breed, produce, … [and] stock." A7399. Increase is duplicative of those rights and therefore unnecessary. A7521 (142:5-144:9); *Webster's Third New International Dictionary* 274 (1993) ("breed": "to propagate animals or plants"); *id.* at 1817 ("propagate": "increase, extend"); *id.* at 1810 ("produce" as "to cause to accrue"); *id.* at 13 ("accrue": "to increase in value or amount gradually as time passes").

Bayer incorrectly contends there must be a "disputed issue of fact" because the foreign law experts reached different conclusions regarding the meaning of Article 3.1.2. BOB 40. But it is the court's role to interpret a contract as a matter of law, something courts routinely do even against the backdrop of opposing views offered by the parties: "[T]he interpretation of a contract is generally a question of law."

---

A2329-30 n.9). Yet, there DAS just observed that "Bayer has not suggested this [exception clause] is applicable to" E3, and noted that "DAS does not have a copy" of the separate Bayer-Stine Seed Agreement, which is relevant to interpreting the exception clause. A2329-30 n.9; BOB 44.

*United States v. Hardwick*, 544 F.3d 565, 570 (3d Cir. 2008); *accord Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381, 1384 (Fed. Cir. 1996) ("Interpretation of a contract is a question of law"); 10B Wright, Miller & Kane, *Federal Practice & Procedure: Civil 3d* § 2730.1 (1998). "'Conflicting opinions on a legal issue … raise no issue of fact,'" and "are no obstacle to … summary judgment." *SRI Int'l, Inc. v. Advanced Tech. Labs, Inc.*, No. 93-1074, 1994 WL 712487, at *4 (Fed. Cir. Dec. 21, 1994) (quoting *Petersen Mfg. Co. v. Central Purchasing, Inc.*, 740 F.2d 1541, 1548 (Fed. Cir. 1984)); *accord Ford v. Panasonic Corp. of N. Am.*, 284 F. App'x 901, 903-04 (3d Cir. 2008) (affirming summary judgment where "conflicting expert testimony" regarded "disagreement over a legal interpretation"); *Banco de Credito Indus., S.A. v. Tesoreria Gen.*, 990 F.2d 827, 838 (5th Cir. 1993) (when experts disagree on "a question of law," those "differences of opinion … may not be characterized as a genuine issue as to any material fact." (quotation marks omitted)).[5]

---

[5] *Paton v. La Prade*, 524 F.2d 862 (3d Cir. 1975) (*cited by* BOB 40), does not hold that expert disagreements about *legal issues* constitute genuine disputes of material *facts*. The issue there was whether expert affidavits must be "based on personal knowledge." *Id.* at 871.

Moreover, Bayer's expert could not even reach the relevant conclusion.  Bayer gave its expert only the agreements and one-sided "instructions from [counsel]," A11,262-64 (¶ 6, 17), including an instruction that Bayer's interpretation is commercially reasonable, A12,440 (175:11-25) ("instruction … [that] the right to exploit MS soybean events without a right to commercialize is still a valuable right").  This was not lost on the district court, which observed that Bayer's expert was not "so confident in [his] opinion."  A12,471 (206:5-18).  Bayer's expert concurred.  *Id.*

> ### 2. Other provisions confirm MS Tech's right to make, have made, and sell glyphosate tolerant soybeans under Bayer's patents.

Although the plain textual reading set out above suffices to resolve this case, additional provisions in the Bayer-MS Tech Agreement confirm the plain reading.

The first recital provides:  "[Bayer] has decided to divest the Asset and to grant licenses to certain of [Bayer's] Patents … and to grant such rights as [Bayer] is allowed to give."  A7397.  As Bayer's expert testified: "[D]ivestiture does not include the retention of rights by Bayer," because "divest" is "'a strong term meaning do away with'" and

Confidential
Material Omitted

"'entirely … give up rights.'"  A23 (quoting A12,462-64 (197:19-25,

199:16-18)).  MS Tech's receipt of an exclusive license to make and sell

effectuates Bayer's decision to divest its soybean business and license

its patents accordingly.  A22-23.[6]

Still other provisions confirm that MS Tech is licensed to make,

have made, and sell glyphosate tolerant soybeans.  For example,

because the Bayer Soybean Events were made using the ████

patents, MS Tech was granted a sublicense under Article 3.1.5 and

Exhibit 3.1.5 to those patents (as "Licensed Rights").  Exhibit 3.1.5 sets

out the terms of MS Tech's sublicense to those patents and requires

MS Tech to pay ██████████ of dollars in fees to Bayer "in the

event that [MS Tech] …, either *directly or indirectly*, *Commercialize[s]* a

Licensed Product."  A7427-28 (¶ B(a)(i)-(iv)) (emphasis added).  The

agreement defines "[c]ommercialize" to include the "*sale … of Licensed*

*Product(s)*," such as "seeds, plants, plant parts or pollen exhibiting

---

[6] Bayer argues the first recital does not refer to M.S. Soybean
Events because it mentions "Asset[s]."  BOB 2-3; *accord* BOB 45-46.
But the recital expressly refers to patent licenses.  Moreover, the sixth
recital (upon which Bayer relies, *see infra* § I.B.1) likewise expressly
refers only to Assets.  7398.  If, as Bayer contends, Asset does not
include M.S. Soybean Events, then the sixth recital "carve out" cannot
help Bayer.

glyphosate tolerance … containing a Bayer Soybean Event." A7426 (emphasis added). Thus, the agreement contemplates "sale[s]" by MS Tech of Bayer Soybean Events.

Significantly, it is undisputed that MS Tech's license to "Exploit" Bayer Soybean Events is indistinguishable in scope from its license to M.S. Soybean Events. BOB 24 n.5; A7608 (151:5-10). The provisions are identically structured and use the same defined terms. *See* A7403 (¶¶ 3.1.1-3.1.2). The only substantive difference is that Article 3.1.1 involves Bayer Soybean Events and Article 3.1.2 involves M.S. Soybean Events. Thus, just as MS Tech is licensed to make and sell Bayer Soybean Events, it is licensed to make and sell M.S. Soybean Events.[7]

Article 3.1.3 also confirms that MS Tech's license includes the right to make and sell under the asserted patents. In light of the definitions of "Exploit" and "M.S. Soybean Event," Article 3.1.2 means that MS Tech may have others make and sell glyphosate tolerant soybeans so long as the making or selling is "for" MS Tech. A7399-401

---

[7] MS Tech's right to commercialize Bayer Soybean Events is also memorialized in Article 3.1.6, where MS Tech received "rights to quiet enjoyment," extending to "Exploitation" of the glyphosate tolerance trait and "Exploitation" of glyphosate herbicide with respect to the Bayer Soybean Events.

(¶ 1.1) ("Exploit" includes have made or "have done" rights); ("M.S. Soybean Events" are events made "by or for" MS Tech). But for MS Tech to authorize a licensee to sell glyphosate tolerant soybeans for the licensee (i.e., not "for" MS Tech), MS Tech needed the sublicensing grant of Article 3.1.3: "The license described in Article 3.1.1. and Article 3.1.2 shall include the right to sublicense the Bayer Soybean Events and the M.S. Soybean Events." A7403. By reading the agreement to license MS Tech to make and sell soybeans, Article 3.1.3 has meaning: Article 3.1.2 permits MS Tech to have others make and sell M.S. Soybean Events for MS Tech while Article 3.1.3 authorizes MS Tech to sublicense others to sell M.S. Soybean Events for the licensees' own benefit.

### B. The District Court Correctly Rejected Bayer's Readings Of The Agreements

#### 1. The district court correctly rejected Bayer's theory that MS Tech's rights to market, offer, and sell were "carved out."

Bayer contends that MS Tech's rights to "increase, market, distribute for sale, sell and offer for sale" were "carved out" completely from MS Tech's license when they were nonexclusively licensed to Stine Seed. BOB 38-44. But, as explained (§ I.A), MS Tech's right to sell

**Confidential
Material Omitted**

soybeans is demonstrated by (among other things) Article 3.1.2,

MS Tech's right to "Exploit" (including "market, offer, [and] sell"), the

right to "commercialize" under the ███████ patent, and the right to

grant commercial sublicenses in Article 3.1.3.  In seeking to override

those provisions, Bayer places "great emphasis" on the sixth recital,

A24, which states:  "[S]ome rights regarding the Asset will be granted to

Stine [Seed] and will hence be carved out from this Agreement."  A7398;

*cf.* A12,253 (¶¶ 6-7) ("strongly disagree[ing] with the weight … [Bayer]

place[s] upon the sixth recital").

If, as Bayer contends (BOB 2-3; *accord* BOB 45-46), Asset does not

include M.S. Soybean Events, then the sixth recital "carve out" cannot

help Bayer.  *See supra* at 33 n.6.

But regardless, the sixth recital does not identify what was

"carved out."  A7398.  The recital refers to "rights … granted to Stine

[Seed]," A7398—i.e., Stine Seed's nonexclusive license "to increase,

market, distribute for sale, sell and offer for sale Soybean seeds

containing the Bayer Soybean Events and/or the M.S. Soybean Events."

A7933 (¶ 2.1.1); *see also* A7403 (¶ 3.1.2).  Under this provision, a limited

right was carved out from MS Tech:  The exclusivity of its right to sell

**Confidential
Material Omitted**

was carved out, leaving MS Tech with the exclusive right to make and

an exclusive right to sell vis-à-vis everyone other than Stine Seed,

against whom MS Tech has a nonexclusive right to sell.

Because both party's interpretations recognize a "carve out" from

MS Tech's license, the sixth recital does not support Bayer's theory of

*what* was "carved out."  A24; A12,253-54 (¶¶ 7-11) (Bayer's reading of

"carve out" is a "question-begging" "tautology" that does nothing to

confirm or disprove either party's interpretation).

Bayer also argues that the right "to sell soybean[s]," BOB 3, must

have been "carved out" because "carve out" was used two other times

during the negotiations and, in those occasions, "'carve out'

unambiguously meant removal of rights."  BOB 39.  Bayer relies on the

Fourth Amendment to the Heads of Agreement (like a Memorandum of

Understanding), which recites that the parties "agreed to carve out

███████████████████████████████████████████████"  A7992; BOB 39.

Bayer also points to removal of an insecticide tolerance, ███████,

from one of the 14 agreements.  BOB 39-40.

Both of Bayer's examples of "carve out" are based on "pre-

contractual negotiations" and drafting.  This type of evidence is

categorically inadmissible under English law for "construction of contracts." A10,110-12 (¶¶ 32-36); A12, 18 n.8; A8004-06 (¶ 17).

Bayer argues that if the "carve out" language is inconclusive, the contract must be ambiguous. BOB 12 (discussing Prof. Peel testimony). Not so. The "carve out" simply does not aid Bayer and does nothing to undermine the plain language reading of Article 3.1.2. *See Anderson*, 477 U.S. at 249 (nonmovant must adduce "sufficient evidence" in its "favor[]" to properly raise a genuine factual dispute).[8]

## 2. The district court correctly rejected Bayer's theory that MS Tech's license does not include "seeds."

Alternatively, Bayer argues that even if MS Tech is licensed to make and sell glyphosate tolerant soybeans under the asserted patents, the license does not include "seeds." BOB 2-4, 23, 28, 42-43. Bayer's theory is that "events" are limited to when "a gene … is inserted into a plant's genome at a specific site," BOB 2 n.1—in other words, just the DNA, not seeds containing the DNA. This is Bayer's "events-only

---

[8] Although Bayer repeatedly refers to a "split up" of rights, BOB 5, 18-19, 33, 37, 43, 50, that term is not in the agreements.

**Confidential
Material Omitted**

theory," which, as Stine put it, is "absolutely ridiculous." A7289-96
(51:21-52:4, 22:24-23:2).

That exploitation of "events" necessarily includes seeds containing
the events is evident from the agreement. "Exploit," for example,
includes the right to "breed, produce, condition, … import, export, [and]
stock." A7399 (¶ 1.1). But "[y]ou can't breed with events," A7296
(50:22-24), or "stock" events, A7633 (38:24-39:18). Similarly,
"'[c]ondition' is actually a technical term" involving "cleaning,
packaging, treating" and "handling seed[s]" once they have been stocked
and are nearing sale. A7296 (50:25-51:20); *see also* A7496 (43:18-44:19)
("produce," "import," and "export" all "necessarily mean seed").
Furthermore, the ▮▮▮▮ patent license expressly contemplates
MS Tech selling "seeds." A7426. Exhibit 3.1.5 permits the sale of
"Licensed Product[s]," such as "seeds … exhibiting glyphosate tolerance
… containing a Bayer Soybean Event." *Id.*

Moreover, if, as Bayer argues, MS Tech's rights were limited to
"events" and did not include seeds, and Stine Seed's rights were limited
to "seeds" and did not include events, BOB 28, then there would have
been no need to "carve out" Stine Seed's rights from MS Tech. Each

would have received distinct rights, one to seeds and one not to seeds. But the Bayer-Stine Seed Agreement acknowledges that Bayer "entered into a license agreement with M.S. [Tech] pertaining to the *subject matter* of this license [with Stine Seed]," and required MS Tech to "specifically consent[] to the above license." A7933 (¶ 2.1.3) (emphasis added). Because "there would be no need to consent to non-overlapping rights," Bayer's interpretation is "[in]consistent with ... MS Tech ... specifically consent[ing] to [the Stine Seed] agreement." *See* A22.

Bayer's "events-only theory" is also inconsistent with Article 9.1.2 (indemnification) and Article 11.3 (confidentiality), which both "contemplate full exploitation" by MS Tech. A21-22; *accord* A7410-13; A8023-24 (¶¶ 63.10.1-63.10.7). Bayer argues these provisions still function because, in exploiting events, MS Tech could "plant[] seeds" and this could lead to problems necessitating indemnification and disclosure. BOB 45. But if "events" are when "a gene ... is inserted into a plant's genome at a specific site," BOB 2 n.1, there would be no "planting [of] seeds," BOB 45.

Bayer's "events-only theory" was also rejected by its expert. He explained: "Without ... the 'carve out' [i.e., if MS Tech can sell

40

glyphosate tolerant events] …, I would see force in Professor Peel's conclusion that the right to exploit the genes would include the right to produce seeds in commercial quantities." A11,283 (¶ 64). This was true, he reasoned, because others of the 14 contemporaneous agreements included the term "events" (not "seeds"), and it "would not make commercial sense if [those agreements] did not include the right to sell seeds." A11,284 (¶ 69) (citing A7432-54 (¶¶ 3.1.1-3.1.2)); *see also* A7507 (86:6-87:21).

In short, "events" is a broad term that includes the rights to traits and technology *in addition to the seeds themselves.* A7659 (142:6-15). Bayer's own in-house counsel explained that "events" include not only transformed DNA but also seeds produced by plants containing the transformed DNA. A7581 (12:17-22). Indeed, "an event is … expressed in a seed," A7659 (142:6-15), so trying to separate "seeds" from "events," as Bayer urges, is not only "biologically impossible," it is also "nonsensical," A7496 (43:4-11). Accordingly, Bayer's regulatory filings often use "events" to refer to seeds. A7597 (109:5-113:9). Bayer's lead business person for its divestment (Morgan) was emphatic: "Yes[,] of

course" MS Tech has the right to commercialize "[s]eeds containing" glyphosate tolerance.  A7242 (107-23-108:3).

Against all of this, Bayer notes only that the MS Tech Agreement uses "events" and the Stine Seed Agreement uses "seeds," BOB 2-4, 23, 42, so the "different language … *must*" mean something, and Bayer speculates that it means that MS Tech did not obtain rights to seeds. BOB 43.  But the plain language is easy to understand:  The Stine Seed Agreement uses the "narrower" term "seeds" because Stine Seed obtained only a "subset" of the broader grant of "event" rights that MS Tech obtained.

* * *

In sum, reading Article 3.1.2 of the Bayer-MS Tech Agreement with Article 2.1.1 of the Bayer-Stine Seed Agreement, Bayer granted MS Tech an "***exclusive license***" to make, have made, and sell glyphosate tolerant soybeans.  The "exception of" the "***non-exclusive license***" to Stine Seed did not remove from MS Tech its authority to make and sell glyphosate tolerant soybeans or its right to license to DAS to make and sell glyphosate tolerant soybeans.  This plain reading

is confirmed by Article 3.1.2's structure and syntax as well as other

provisions of the agreement.

## II. MS TECH IS LICENSED TO MAKE, HAVE MADE, AND SELL GLYPHOSATE TOLERANT SOYBEANS IN LIGHT OF THE AGREEMENTS' COMMERCIAL PURPOSE AND UNDISPUTED BACKGROUND FACTS

If this Court believes analysis beyond the plain text is warranted

in determining the "objective[]" meaning of the contract, it can consider

"all the background knowledge … reasonably … available to the

parties" when the contract was executed (i.e., the "factual matrix").

A13.  Where "there are two possible [contract] constructions, the court

is entitled to prefer the construction which is consistent with business

common sense and to reject the other."  A8010 (¶ 27) (quoting *Rainy*

*Sky S.A. v. Kookmin Bank* [2011] UKSC 50; [2011] 1 WLR 2900 at [21]

and [43] (U.K.)).  Here, the undisputed factual background and

"business common sense" demonstrate that Bayer licensed MS Tech to

make, have made, and sell glyphosate tolerant soybeans.  A8006-07

(¶ 11).

Bayer's view is that MS Tech is licensed to make DNA but not to

sell glyphosate tolerant soybeans.  As explained, that does not square

with the plain language.  It also makes no commercial sense.  Among

43

other things, Bayer's theories require this Court to find credible that (1) Bayer retained, at MS Tech and Stine Seed's request, valuable commercial rights even though Bayer's goal was to get out of the soybean business; (2) MS Tech paid a million dollars to develop only soybean DNA, but not seed it could sell or on which it could obtain regulatory approval; (3) MS Tech and Stine Seed requested that the deal be structured so MS Tech could not sublicense to anyone but Stine Seed and Bayer; and (4) Stine Seed's "limited" "non-exclusive" commercial rights replaced MS Tech's exclusive rights to exploit the innovative soybean.   None of this is plausible on the undisputed record.

Bayer's appellate brief raises a series of speculations about what the undisputed facts mean.  As detailed below, "pure supposition," *Jackson*, 594 F.3d at 226, does not create genuine dispute.  So too, because there are no genuine disputes of material fact, the district court did not "nullif[y]" Bayer's Seventh Amendment right to a jury trial. BOB 52.  Where summary judgment is appropriate, the Seventh

Amendment is not implicated. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336 (1979).[9]

## A. The Commercial Purpose Of The Agreements Is Undisputed And Confirms DAS's Interpretation

The undisputed facts demonstrate that the commercial purpose of the agreements among Bayer, MS Tech, and Stine Seed required Bayer to license MS Tech to make, have made, and sell glyphosate tolerant soybeans.

### 1. It is undisputed that Bayer decided to no longer make or sell glyphosate tolerant soybeans.

Bayer's plan to divest its soybean business explains why Bayer licensed MS Tech to make, have made, and sell under the asserted patents. As detailed above, and as testified to by Bayer's in-house counsel, the agreements' "premise" was for Bayer to "divest certain assets." A7583 (27:8-16); *accord* A7397 (First Recital); A7812-16 (160:14-21, 172:16-175:14); A7230-31 (61:23-62:8). Bayer's senior

---

[9] Bayer's reliance on *Mylan* does not change the analysis. 723 F.3d at 418 (*cited by* BOB 2, 9, 52-53). *Mylan* holds that, in a contract case, a district court errs by "refusing to consider" "all relevant evidence." *Id.* at 419-20. Here, the district court properly considered the relevant evidence under English law and found that evidence undisputed. A17.

Confidential
Material Omitted

business leader for divestment explained:  The agreement was a "relatively black and white" way for Bayer to "divest[]."  A7230-31 (61:23-62:8).

Bayer characterizes its divestment as not a *full* divestment because "Bayer owns the patents," BOB 37 (citing its complaint), and Bayer retained some rights related to a different herbicide, ▮▮▮▮, not at issue here.  BOB 48-49.  Bayer did not outright sell the patents because they cover other crops besides corn and soybeans, which is irrelevant to the commercial purpose here.  All agree that Bayer decided to sell its physical assets and license its glyphosate tolerant soybean technology and that Bayer had no intention of itself selling glyphosate tolerant soybeans.  A7583 (27:8-16); A7812, 7815-16 (160:14-21, 172:16-175:14).

Attacking the testimony of Morgan and Stine, Bayer argues that "[c]redibility and bias questions are not properly resolved on summary judgment."  BOB 34.  But only *genuine* disputes of *material* fact preclude summary judgment.  Fed. R. Civ. P. 56(a).  A *genuine* dispute requires Bayer to adduce "sufficient evidence" in its "favor[] … for a jury to return a verdict for [Bayer]."  *Anderson*, 477 U.S. at 249.

46

Confidential
Material Omitted

"[D]iscrediting the credibility of [DAS]'s evidence" does not suffice;

Bayer "must produce some affirmative evidence" contrary to that

offered by DAS. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d

1358, 1363 (3d Cir. 1992).

Even if considered, Bayer's "[s]pecious objections will not, of

course, defeat … summary judgment." *El v. Se. Pa. Transp. Auth.*

*(SEPTA)*, 479 F.3d 232, 238 (3rd Cir. 2007) (*cited by* BOB 34).  Morgan's

testimony—that Bayer was divesting its glyphosate tolerant soybean

technology—is supported by Morgan's contemporaneous email to Saluri

and Stine at the conclusion of the deal, *supra* at 12 (quoting A7620),

and not disputed by Bayer, BOB 16; A7583 (27:8-16); A7812-16

(160:14-21, 172:16-175:14).

Morgan testified that he "swore an oath," testified truthfully, and

has no "ax to grind." A7242 (108:8-109:14).  Nevertheless, Bayer

quibbles with ███████████████, BOB 49 n.12.  He was Bayer's

senior business leader for its divestment. A7222-26 (26:16-23,

43:2-44:5); BOB 17 (citing A8559 (¶ 19)).  Bayer alleges that Morgan

would not testify ████████████████, BOB 49 n.12, but it was Bayer

that ████████████████████████████████████████████████████

**Confidential
Material Omitted**



, A7252 (146:8-22). Bayer attacks Morgan

because he would not testify about

, BOB 49 n.12, for which he is

A7251-52 (143:17-146:13). Morgan

testified that he is

A7252 (147:7-148:9).

Bayer also attacks Stine, claiming he must be biased because of

"the commercial benefits from DAS that [he] enjoys if his position is

ultimately adopted." BOB 34. This contradicts Bayer's claim that its

interpretation is better for Stine. BOB 34-35. And Stine's testimony—

that the exception clause was not a limitation on MS Tech and that the

division of rights was immaterial to Bayer—was undisputed by Bayer's

witnesses. A7594 (97:7-98:10); A7817 (180:18-23); A11,409 (¶ 23).

In any event, Bayer does not attack the credibility of Saluri or

Justice Mansfield (MS Tech's then-outside counsel for the deal and

current Iowa Supreme Court Justice). Each testified consistently with

Morgan and Stine.

Thus, Bayer's purported impeachment is not genuine and not

material.

## 2.    It is undisputed that MS Tech planned to make and sell glyphosate tolerant soybeans.

MS Tech's intention to make and sell genetically modified soybean explains why MS Tech obtained such a license from Bayer under the asserted patents.  MS Tech seized the opportunity provided by Bayer's divestment.  A7287-90 (15:3-16:11, 17:16-25, 26:9-27:5); A7488-93 (11:21-12:18, 16:13-25, 29:11-30:6); A7632-34 (35:13-37:12, 43:6-45:2).  For MS Tech, the agreement's commercial purpose was to use the licensed technology to "develop business" for itself and its "licensees." A7230-32, 7242 (60:8-62:8, 63:8-66:2, 106:10-12).  MS Tech was going to "make money" by commercializing soybeans itself, A7494 (34:2-19), and by "out-licens[ing] to the various seed distributing companies," A7291 (30:3-31:10); s*ee* A7254, 7241-42, 7225 (154:9-155:3, 104:9-108:3, 39:20-40:18); A7496-97 (45:21-47:4).  Thus, the rights MS Tech acquired were valuable to it because they gave MS Tech the ability to "make full use of" the right "to exploit the technology and the associated licensed intellectual property."  A7230-31, 7241-42, 7224-26 (61:23-62:8, 105:12-106:12, 35:24-40:12); *accord* A7620.

Confidential
Material Omitted

### 3. It is undisputed that Stine Seed could only obtain a nonexclusive right to sell glyphosate tolerant seeds.

The background evidence and commercial purpose explains why Stine Seed—but not MS Tech—was limited to selling seeds. As Justice Mansfield explained: Stine Seed "could not get broad rights" to "a trait" or "the[] technologies" without potentially triggering undesirable obligations to Monsanto. A7639-40 (65:24-67:4). Accordingly, the agreements were written using different language so Stine Seed would obtain only narrow "seed" rights, while MS Tech received "event" rights which encompass the narrower seed rights. A7499, 7516-17 (56:22-57:23, 125:14-128:12); A7634-35 (45:15-47:8); A7341 (230:20-231:21).

Bayer argues that DAS's interpretation must be wrong because Stine Seed's license is "worthless" until Stine Seed obtains a separate license from MS Tech after MS Tech completes its development and regulatory work. BOB 34-35. That is true "under both parties' construction[s]" and thus is of no assistance here. A23-24 n.13. Stine Seed's agreement explains: "[Stine Seed] understands that it will

███████████████████████████████████

**Confidential**
**Material Omitted**

█████████████████████" A7933 (¶ 2.1.4).  So, as the district court

explained, "it seems apparent … that parties … find it appropriate to

limit themselves in this manner."  A23-24 n.13; A7341 (233:11-16);

BOB 4, 35-36.

> **B.  The District Court Correctly Rejected Bayer's "Inferences" Of Alternative Commercial Purposes**
>
> **1.  It makes no commercial sense that MS Tech purchased a license without the right to "market, offer, [and] sell" glyphosate tolerant soybeans.**

Bayer contends MS Tech received only the right to "make new

glyphosate tolerant soybeans [M.S. Soybean Events]" but "not … to sell

[the] soybeans" or to "sublicense [the] rights to sell … seeds containing

the … technology."  BOB 2-4.  This makes no commercial sense.

For Bayer, the agreement's commercial purpose was to "divest."

Bayer was leaving the field and, thus, it was "immaterial to Bayer" how

the rights were divided amongst Stine Seed and MS Tech.  A7-8 (citing

A7594 (97:7-24)).  Yet if MS Tech did not receive commercialization

rights, then (as Bayer's witnesses testified) because Stine Seed "only

receive[d] a non-exclusive [commercial] license," *Bayer retained*

*commercialization rights*.  A7792, A7816 (79:25-80:20, 177:13-23);

A7595 (100:5-8); *accord* A22-23.  That is not a divestment.  Bayer

Confidential
Material Omitted

"retained no rights whatsoever" in glyphosate tolerant soybeans, as everyone connected to the deal understood. A7292, 7298 (35:5-36:4, 58:18-60:7); A7634 (44:16-45:2); A7240 (99:12-23); A7492-93, 7499 (29:24-30:9, 54:7-55:15).

Bayer's theory also makes no sense from MS Tech's perspective. Bayer was set to license away—first to ████████ and then to MS Tech—broad exclusive rights under the asserted patents to make, have made, market, offer, sell, and use glyphosate tolerant soybeans. Yet, under Bayer's interpretation, MS Tech voluntarily took less than what Bayer was offering and what MS Tech planned to receive. A7495-500 (41:22-43:3; 57:12-58:10); A7692-93; A11,409 (¶ 23). "Why would MS Tech tie its hands so … it wouldn't be able to sell the seeds?" Justice Mansfield asked rhetorically. "I don't think that's a reasonable interpretation," he answered. A7659 (143:25-145:19). Saluri and Stine agreed. All testified that the agreement's commercial purpose was for MS Tech to obtain a "whole bundle of rights" to "exploit," and they therefore rejected as "ridiculous" Bayer's theory that MS Tech voluntarily signed away any of its exploitation rights. A7634-35, 7656-59 (42:15-47:8, 130:13-134:13, 143:25-145:19); A7289, 7291-92

(22:12-23, 31:25-37:17); A7495-500, 7524 (41:22-43:3, 52:11-55:15, 57:12-58:10, 157:7-23).

Morgan, Bayer's executive overseeing the deal, was definitive: "Yes, of course" Bayer granted MS Tech the right to sell soybeans. A7241-42, 7254, 7225 (104:9-108:3, 154:9-155:3, 39:20-40:18); A7620. MS Tech could "make full use of" and "exploit the technology and the associated licensed intellectual property." A7231, 7241-42 (62:3-8, 105:12-106:12).

Bayer responds that this undisputed evidence is "subjective" and inadmissible. BOB 27, 31-32, 36-37. Not so. As Bayer's expert explained: English law excludes subjective evidence of "what [the parties] thought [the contract's terms] meant." A12,410-14 (145:14-146:25, 148:16-149:3). The district court did not consider what the parties believed the terms meant. Instead, the district court took into account admissible testimony about the agreement's commercial purpose and genesis. A13, 22-23.

Contrary to Bayer's argument, BOB 32-33, the district court also did not improperly "rel[y]" on subjective evidence involving Stine. Bayer argued (without evidentiary support) that Stine must have

Confidential
Material Omitted

intended the exception clause to limit MS Tech's rights because he

would make more money if only Stine Seed could sell seeds.  A18-19;

BOB 34-36.  But Stine testified that, under the deal, MS Tech would

make money by selling soybeans itself and by granting commercial

sublicenses and that no one contemplated limiting MS Tech's rights.

A7289-92 (22:12-23, 31:25-37:17).  Regardless, the evidence was not

used to interpret the agreement but to rebut Bayer's requested

inference regarding Stine's irrelevant subjective intent.  A18-19.

> **2.     It makes no commercial sense that MS Tech
> purchased a license without the right to "make,
> [have made,] ... market, offer, sell, ... [and] use"
> glyphosate tolerant soybean seeds.**

Under Bayer's "events-only theory," MS Tech purchased only the

right to "Exploit" "events"—narrowly defined as a transformed "gene,"

BOB 2 n.1—and not soybean seeds containing the "event."

Given Bayer's ███████████████████████████ A7224-28

(34:22-35:10, 50:21-51:21), it makes no sense that Bayer would have

sold its "event" rights where Bayer was strong but kept its rights to

commercialize "seeds," where Bayer ███████████ and would still

have had to ███████████████████████████████████

████████████████████████████████████████

A7223-28 (33:24-35:23, 49:4-51:21). Yet, under Bayer's "events-only" theory," that is precisely what Bayer did. That is implausible.

Bayer's "events only" theory also makes no sense from MS Tech's perspective. Under Bayer's construction, MS Tech has no commercial seed rights and, because it lacks those rights, cannot sublicense them to others. Such a license with no commercial seed rights "flout[s] business common sense," A8026 (¶ 66), because "the only way of … extracting the value of this technology" is by selling or sublicensing the "seed[s]," A7225 (39:20-40:12).

If MS Tech has no commercial seed rights, MS Tech obtained only the privilege to spend at least "tens of millions of dollars," A7288 (18:20-19:25), to conduct research and development with little hope of recovering its investment, A11,414 (¶ 40). This would be so because MS Tech could only license the events to Stine Seed and Bayer.

Without a viable commercial explanation for MS Tech, Bayer focuses on Stine Seed's commercial interests. But both MS Tech and Stine Seed's licenses would be worthless under Bayer's interpretation. To sell a genetically modified organism for food, a party must obtain approval ("deregulation") from the U.S.D.A. 7 C.F.R. §§ 340.0-340.1,

Confidential
Material Omitted

340.6.  Its agreement with Bayer explicitly contemplates MS Tech

seeking and obtaining "regulatory" approval.  A7404, 7413 (¶¶ 3.1.4,

11.3(v)).  However, without the right to use, research, and develop

"seeds," MS Tech cannot obtain the necessary regulatory approval,

A7295-96 (49:21-50:9); A7496 (44:20-45:13), nor could Stine Seed

without the necessary research-and-development authority, A7609

(154:8-12); A7496 (44:20-45:13).[10]

Notwithstanding, Bayer contends that an arrangement where

MS Tech cannot sell seeds or sublicense the right to anyone but Stine

Seed and Bayer makes sense for Stine Seed because then "MS[ Tech]

would not freeze out Stine [Seed]."  BOB 35.  Putting aside that this

does not account for MS Tech or Bayer's commercial purpose, it is also

wrong as to Stine Seed:  If MS Tech can license back to Bayer to sell

seeds, MS Tech can still "freeze out" Stine Seed.  Indeed, Stine did not

even receive rights to the ███████ patents.

---

[10] Bayer suggests its seed rights went to "Stine Seed Farm, **Inc.**,"
who Bayer claims is a "large[] independent seed company."  BOB 3, 17
(citing A3602, 3734).  But that evidence is about a different entity:
"Stine Seed Farm **Company**."  A3602 (11:17-23).

## C. There Are No Disputed Background Facts Relevant To The Commercial Purpose Of The Agreements

### 1. Speculation about why Stine Seed paid more than MS Tech does not create a genuine dispute.

Bayer argues there is a genuine dispute regarding why MS Tech paid Bayer $1 million and Stine Seed paid Bayer $4.6 million. BOB 6, 29.

A "genuine dispute" requires the nonmovant to adduce "sufficient evidence" in its "favor[] … for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "[S]peculation and conjecture" do not create genuine disputes. *Acumed LLC v. Advanced Surgical Serv*s., *Inc.*, 561 F.3d 199, 228 (3d Cir. 2009).

Yet, Bayer speculates that Stine Seed paid more to obtain more valuable rights. BOB 6, 29. But Bayer's corporate witness regarding the agreements' negotiating, drafting, and meaning testified: "I don't know why" "Stine [Seed] paid more." A7801-02 (115:13-116:15).

In contrast to Bayer's speculation, "MS Tech and Stine [Seed] have offered a rationale for the [deal's] structuring." A23-24 n.13. MS Tech was taking on expensive development and regulatory obligations. So even though Stine Seed paid more upfront, MS Tech

Confidential
Material Omitted

would pay "[t]ens of millions of dollars" more long term.  A7288, 7295

(19:6-25, 46:20-47:19); A7490-91, 7516 (21:7-23:16, 123:14-124:3).[11]

But regardless, Bayer can defeat summary judgment only with

"inferences" drawn "from the evidence," *Conopco, Inc.,* 572 F.3d at 165.

There is no evidence supporting Bayer's speculation why Stine Seed

paid more.

Bayer also argues that the district court failed "to accord" Bayer

"the most compelling inference" that if Stine Seed was only getting a

subset of MS Tech's rights, Stine Seed would not have contracted with

Bayer and would have contracted directly with MS Tech.  BOB 29,

49-50.  Bayer wonders:  "[W]hy would Bayer have needed to separately

license Stine [Seed]?"  BOB 29 (emphasis omitted).  But, again,

speculation cannot defeat summary judgment.  In 2004, MS Tech "was

█████████████████████████████████" so Stine Seed was brought in to ████

██████████████████████████ A7499, 7513 (56:3-57:23, 110:3-8). ██

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[11] Whether "regulatory costs … affect the license value," BOB 6, is
irrelevant.  MS Tech was taking on more than regulatory costs.

Confidential
Material Omitted



A7295, 7339

(47:2-8, 224:24-225:22).

Bayer questions the

BOB 36 & n.8.  Such arrangements are not uncommon.  A7339-40

(224:24-226:3).  Moreover, as Stine explained:

A7339-40 (225:23-226:13),

A11,055-58

(¶ 5.1.2); A7892-95 (¶¶ 4.1(a), 4.2(d)-(e)).

### 2. It is undisputed that MS Tech and Stine Seed are not "affiliates."

Bayer criticizes the district court's conclusion that "whether

MS[ Tech] and Stine [Seed] were affiliates was immaterial."  BOB 7

(citing A23-24 n.13).[12]  Bayer argues affiliation is relevant to the

patent issue because, according to Bayer, if MS Tech and Stine

---

[12] The Bayer-MS Tech Agreement defines "Affiliate" as a

A7398 (¶ 1.1).

*Id.*

Confidential
Material Omitted

Seed are affiliates then MS Tech can "direct[ly] commercializ[e]" through Stine Seed. BOB 47.

The question of "affiliation" is not genuinely disputed. Under English law, a court looks to "the relevant facts … so far as known to the parties" at the time. A10,098 (¶ 13); *accord* A13. Contemporaneous internal correspondence within Bayer reads: "████████ is out of the deal and to be replaced everywhere by Ms [*sic*] Technologies. This company is NOT an affiliate of Stine, they have only a small minority interest in it. So we are in fact selling to two separate and mostly independent parties." A12,249. Stine concurred: It is "totally erroneous" to say that Stine Seed and MS Tech are affiliates. A7290 (28:22-13). As Bayer concedes, BOB 18, when the agreements were executed, MS Tech was owned ████ by ████████████, who has no interest in Stine Seed, A7290 (28:10-29:4), and ████ by ████████████, 7509 (96:3-12), in which Stine Seed has no interest, *see* A7507-08 (89:4-91:22). Bayer's corporate witness testified categorically: "MS Tech and Stine [Seed] are not affiliates." A7806 (136:11-15).

Confidential
Material Omitted

Bayer tries to create a dispute over affiliation by conflating Stine, the person, with Stine Seed, the company. *Compare* BOB 23, 47. No matter, even as to Stine, though he may be one of ███ managers of MS Tech, BOB 18, he was unequivocal that he does not and did not control MS Tech, A7290 (28:22-29:17), any more than any one manager of Coca-Cola 'controls' that company.

In any event, affiliation alone would not begin to call the district court's assessment of the relevant commercial purposes into doubt. This issue is immaterial. A17-18.

## III.  MS TECH LICENSED DAS TO MAKE AND SELL GLYPHOSATE TOLERANT SOYBEANS

A few years after MS Tech purchased from Bayer the right to have M.S. Soybean Events made "for" it, A7403 (¶ 3.1.2), along with the "right to sublicense" the M.S. Soybean Events, A7403 (¶ 3.1.3), MS Tech exercised those rights. In 2008, MS Tech agreed that DAS would "perform certain activities on behalf of MS Tech for the purposes of development of [E3]," A11,052 (¶ 4.1), and—once E3 was developed— MS Tech would "grant[] DAS licenses … so as to permit DAS to … Exploit [E3]," A11,054 (¶ 4.5).

Under the plain language of those agreements, DAS is licensed to make and sell the E3 Soybean. Although Bayer makes no less than eight attempts to show a genuine dispute of material fact concerning DAS's license, each effort fails. The district court properly granted DAS summary judgment.

## A.  DAS Made E3 For MS Tech And MS Tech Sublicensed DAS To Make And Sell E3

E3 is an M.S. Soybean Event as that term is defined in the Bayer-MS Tech Agreement. Under that agreement, "M.S. Soybean Event" is a "Soybean transformation event[] comprising Glyphosate Tolerance Genes *made by or for* [MS Tech]." A7401 (¶ 1.1) (emphasis added).

There is no dispute that E3 is a "soybean transformation event" comprising the "Glyphosate Tolerant Gene[]", *dmmg*.

There is also no genuine dispute that E3 is made "for" MS Tech: The MS Tech-DAS Agreement authorizes DAS to make E3 "for" MS Tech.[13] The plain meaning of "for" "indicate[s] the person or thing that something is to be delivered to … or assigned to." *Webster's* 886.

---

[13] "For" is used in the Bayer-MS Tech Agreement and is thus construed under English law. *See* A7414 (¶ 12.1).

Moreover, both "the factual matrix and commercial purpose … indicate that the parties intended to afford MS Tech extremely broad rights … to utilize the assets it acquired as it saw fit." A28.  The district court was thus correct to conclude that "made … for" includes "any actions taken that inure to the benefit of MS Tech." A28.

The MS Tech-DAS Agreement provides:  "DAS may perform certain activities ***on behalf of*** MS Tech for the purposes of the development of [E3]." A11,052 (§ 4.1) (emphasis added).[14]  The ordinary meaning of performing activities "on behalf of" MS Tech includes activities "for" MS Tech.  "[T]he plain meaning of 'on behalf of'" "encompasses acting in a representative capacity." *United States v. Romero*, 293 F.3d 1120, 1126 (9th Cir. 2002).  *Accord Webster's* 198 ("on behalf of": "in the interest of" or "as the representative of"); *American Heritage Dictionary* 119-20 (1973) ("on behalf of": "as the agent of; on the part of"); *Webster's* 40 ("agent": "one that acts *for* or in the place of

---

[14] "[O]n behalf of" is used in the MS Tech-DAS Agreement and is thus construed under Illinois law, A11,048, which provides:  "If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of" any record evidence.  *Air Safety*, 706 N.E.2d at 884; *Estate of Schneider v. Ralston*, 127 N.E.2d 445, 450 (Ill. 1955) (same).

another by authority from him" (emphasis added)).  Thus, the MS Tech-
DAS Agreement's plain language demonstrates that by agreeing to
make E3 "on behalf of" MS Tech, DAS acted as MS Tech's "agent" or
"representative," and thus made E3 *for* MS Tech.

In addition to "on behalf of," the MS Tech-DAS Agreement reflects
that DAS will make E3 "for" MS Tech because it contemplates that
MS Tech will "permit" DAS to sell E3.  The Agreement provides:
"MS Tech shall enter into … agreements granting DAS licenses …
under MS Tech's rights … so as to ***permit*** DAS to … Exploit [E3]."
A11,054 (§ 4.5(a)) (emphasis added).  "Permit" means "to consent to," "to
give (a person) leave," or "to authorize."  *Webster's* 1683.  That MS Tech
will "permit" DAS to sell E3 supports that DAS make E3 "for" MS Tech.

The parties to the MS Tech-DAS Agreement (MS Tech and DAS)
agree that DAS made E3 "for" MS Tech.  Where "parties [to the
agreement] attached the same meaning to [the] … agreement or a term
thereof, [the agreement] is interpreted in accordance with that
meaning."  Restatement (2d) Contracts § 201(1) (1981); *James v.
Zurich-Am. Ins. Co. of Ill.*, 203 F.3d 250, 255 (3d Cir. 2000).  Here, Stine
and Saluri were unequivocal that E3 was "made … for MS [Tech]."

64

A7497 (48:21-49:15); A7293 (41:15-17).  Similarly, DAS's "Soybean

Global Business Leader" testified:  "[E3] was developed by DAS on

behalf of MS [Tech]."  A8041 (¶ 5).

Though not a party to the agreement, Bayer's views of the

MS Tech-DAS Agreement also confirm that E3 is made "for" MS Tech.

*See* A7807 (140:9-15) (Bayer's corporate witness) ("for" satisfied if

MS Tech "keeps [] ownership to the event"); A7603 (131:10-132:14)

(Bayer's in-house counsel) (same).  The district court found "no dispute

that MS Tech owns E3."  A25-26; A8041 (¶ 5) ("MS Tech owns [E3]");

A7497 (48:21-49:15) (same); A7293 (41:15-17) (same).[15]  Because it "is

undisputed that ownership by MS Tech is sufficient to demonstrate that

E3 was made 'for' MS Tech," A25, MS Tech's undisputed ownership of

E3 independently establishes that E3 was made for MS Tech.

Bayer suggests that DAS could not obtain any ownership rights

from the agreement if DAS was acting "for" MS Tech.  BOB 57 (citing

---

[15] On appeal, Bayer suggests that it is a "disputed" "[f]act"
"whether MS[ Tech] owns E3."  BOB 25.  *See also* BOB 26, 29-30, 54.
That was not Bayer's position below.  A25-26.  Nor is it Bayer's position
in *Bayer III*, where Bayer recently told the international arbitrators:
"MS Tech, not Dow, owns the Enlist E3 soybean event."  Bayer Reply,
*Bayer III*, ¶ 138, Feb. 27, 2014.  *Accord* ¶¶ 178, 141-44, 169.

*CoreBrace LLC v. Star Seismic LLC*, 566 F.3d 1069, 1074 (Fed. Cir. 2009)).  But no one contends that DAS owns E3.  MS Tech owns E3.  In any event, *CoreBrace* confirms that MS Tech could sublicense DAS.  There, the question was whether a licensee with manufacturing rights had inherent rights to have licensed products made by a third party.  566 F.3d at 1070.  The *CoreBrace* contract did not contain sublicensing rights.  This Court concluded that the contractor could manufacture for the licensee but not "for anyone other than the licensee or [to] sell to third parties."  *Id.* at 1073.  Here, Bayer granted MS Tech "have made" rights *and* broad sublicensing rights.  A7403 (¶¶ 3.1.2-3.1.3).  DAS's commercial rights come not from having "made [E3] for" MS Tech, but from a separate sublicense grant.  A11,054 (¶ 4.5).

In sum, the unambiguous meaning of "for" in the Bayer-MS Tech Agreement and unambiguous meaning of "on behalf of" in the MS Tech-DAS Agreement establish that E3 is an "M.S. Soybean Event," and that MS Tech could and did license DAS to make and sell E3.  *Cf. Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 794 (Fed. Cir. 2010) ("contract interpretation is a legal question" and "[s]ummary judgment

is therefore a proper framework for enforcing unambiguous contracts")
(quotation marks omitted).

## B. Bayer Raises Eight Meritless Assertions Of Factual Disputes

Bayer's appeal brief concedes that "on its face, the DAS-MS[ Tech] contract reflects that MS[ Tech] granted a license to E3 … 'for the purposes of development' 'on behalf of MS Tech.'"  BOB 58.  And so long as DAS is making E3 on behalf of MS Tech, there should be no question that DAS can sell E3 as well because MS Tech's sublicense rights are coextensive with its license rights.  A7812 (159:2-11); A7612 (216:19-217:4).  Nevertheless, Bayer makes eight attempts to manufacture genuine disputes of material facts concerning the MS Tech-DAS Agreement.  Each effort fails.  The relevant facts are not disputed.

First, Bayer emphasizes an irrelevant term in the MS Tech-DAS Agreement:  "MS Tech Event."  Bayer focuses on a 2008 email from Justice Mansfield (then MS Tech's outside counsel), BOB 54-57:  "I thought the Authorized Event definition was a little confusing because an Authorized Event might be neither a DAS Event, MS Tech Event, nor a Third Party Event.  For example, the Molecular Stack [i.e., E3] is

none of these." A8374. Bayer contends that Justice Mansfield's statement that E3 is not an "**MS Tech Event**," means there is a genuine dispute as to whether E3 is an "**M.S. Soybean Event.**" Not so.

Bayer confuses two *different* terms. The term at issue in Justice Mansfield's email is "*M.S. Tech Event*," as it is used in the *MS Tech-DAS Agreement*, and defined as an event "made by or for[] *and … Controlled by*" MS Tech. A11,037 (§ 1) (emphasis added). But the relevant term here is "*M.S. Soybean Event*" in the *Bayer-MS Tech Agreement*, defined as an event "made by or for" MS Tech with no control component. A7401 (¶ 1.1).

During his deposition, Justice Mansfield explained that it was the control component of "M.S. Tech Event" that prompted his email: "I think … my concern [was] that MS Tech in some sense really didn't *control* the thing in the sense that it was free to do with the molecular stack whatever it wanted," so even though "the molecular stack was made for MS Tech[,] … [i]t was [potentially] controlled by [] the terms of this collaboration." A7643, 7646 (80:7-81:25; 91:16-92:9) (emphasis added).

But Justice Mansfield left no doubt on the dispositive question of whether E3 was *made for* MS Tech and thus an M.S. Soybean Event: "It's crystal-clear we said for the avoidance of doubt, which is sort of the trump language that we used in the agreement, that the AAD-12 was [being licensed in] to MS Tech and that the event was going to be made for MS Tech." A7647 (95:21-96:4); A27. Bayer ignores this explanation.[16]

Instead, Bayer argues that the district court improperly excluded the Mansfield email. As the district court concluded, however, the Mansfield email is parol evidence inadmissible to alter the unambiguous language of the MS Tech-DAS Agreement governed by Illinois law. A26-27. *Air Safety*, 706 N.E.2d at 884. More fundamentally, as just explained, the Mansfield email does not help Bayer.

Second, Bayer claims a factual dispute over whether E3 is "made … for" MS Tech because DAS contributed two of the genes in E3. BOB 56-57. But while initial ownership of a patent vests in the

---

[16] So too, it is irrelevant whether E3 is defined in the 2008 Agreement as an "MS Tech Event." *See* BOB 56-57.

inventor, *Regents of University of New Mexico v. Knight*, 321 F.3d 1111, 1118 (Fed. Cir. 2003), inventors can assign or license all or part of their interest in patents, 35 U.S.C. § 261. Here, DAS licensed its patented genes to MS Tech to create E3. Moreover, contribution of materials during product development does not determine who the product is made for. *See, e.g., Stewart v. Cunningham*, 548 P.2d 740, 743 (Kan. 1976) (contractor is "one who furnishes labor *or materials* under a contract direct with the owner for the improvement of the property" (emphasis added)). It is also not uncommon for parties to make different agreements as to ownership of products, including those jointly developed. *See, e.g.*, *Synopsys, Inc. v. Magma Design Automation, Inc.*, No. C-04-3923, 2007 WL 322353, at *3 (N.D. Cal. Jan. 31, 2007) (describing such a joint development agreement).

Third, Bayer speculates that if DAS makes E3 for MS Tech, then DAS would not hire the University of Missouri to assist. BOB 59. But whether DAS obtained assistance in developing E3 is irrelevant to whether E3 is "made … for" MS Tech. Contractors often obtain help—from subcontractors—to develop products for the owner. *See, e.g.*, *Stewart*, 548 P.2d at 743 (subcontractor is "one who assumes a portion

of a contract from the original contractor … for the performance of … services or work which the other has obligated himself to perform under contract").

Relatedly, Bayer asserts that DAS did not transfer the *aad-12* gene to MS Tech and, instead, transferred all three genes directly to the University of Missouri. BOB 59 n.14. Again, this would be irrelevant because DAS is allowed to use a subcontractor.

Fourth, Bayer criticizes the testimony from Rojas, Saluri, and Stine. BOB 56. Bayer argues the testimony should be discredited or ignored as "conclusory," and "self-serving." BOB 56 (citing *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263-64 (3d Cir. 2012)). But while "conclusory, self-serving" testimony that contradicts objective facts cannot create genuine disputes, 678 F.3d at 263, here the testimony of Rojas, Stine and Saluri that MS Tech owned E3 is *undisputed*. More importantly, DAS need not rely on this testimony to demonstrate that E3 is made "for" MS Tech. The MS Tech-DAS Agreement's unambiguous language is sufficient.

Fifth, Bayer claims that MS Tech cannot have the same party develop E3 for MS Tech and make and sell it. BOB 58-60. Bayer points

to no such authority.  As the MS Tech-DAS Agreement (and its amendment) demonstrates, MS Tech agreed to have DAS make E3 "for" MS Tech *and* authorized DAS to sell E3 through a commercial sublicense.

Sixth, Bayer asserts a factual dispute over when DAS received commercial rights.  BOB 59.  Not so.  The MS Tech-DAS Agreement specified that MS Tech "shall enter into" an agreement with DAS "to permit DAS" to "Exploit" E3.  A11,054 (¶ 4.5).  Accordingly, MS Tech bound itself to grant DAS a commercial sublicense in 2008 and fleshed out DAS's commercial rights in the 2011 Amendment.  A8530-32 (¶ 7).  Moreover, when MS Tech granted the commercial sublicense is immaterial to the scope of the granted license.[17]

Seventh, Bayer claims that the MS Tech-DAS Agreement was designed to avoid the "bare sublicenses" restrictions in the Bayer-MS Tech Agreement.  BOB 57; *see* A7403 (¶ 3.1.3).  Bayer's

---

[17] Bayer again accuses DAS of taking "contrary" "positions." BOB 59.  Not so.  Below and here, DAS maintains it received some commercial rights from its original agreement with MS Tech, A11,054-59 (§§ 4.5, 5), and that its prospective commercial rights were made more explicit in the agreement's 2011 Amendment, A8530-32 (¶ 7).  *Compare supra* at 13-14 *with* A503-04 (33:20-34:12).

corporate witness on the agreement's meaning testified that "[b]are sublicense[s]" are those not "linked to an M.S. Soybean Event or a Bayer Soybean Event." A7812 (158:17-159:11). Thus, the "bare sublicense" restriction bars MS Tech from granting a sublicense to use the licensed patents for events other than a Bayer or M.S. Soybean Event (e.g., other crops besides soybean). Here, the MS Tech-DAS Agreement's grant to DAS is for an M.S. Soybean Event.

Eighth, and finally, Bayer asserts that the MS Tech-DAS Agreement is a "sham." BOB 57-58. In so arguing, Bayer points to evidence from Justice Mansfield that, in drafting the MS Tech-DAS Agreement, (1) the parties were cognizant of the restrictions imposed by the Bayer-MS Tech Agreement and (2) MS Tech agreed to grant DAS a commercial sublicense. This evidence does not demonstrate a sham or create a factual dispute. As the MS Tech-DAS Agreement's language demonstrates, the parties structured their relationship so as to ensure that E3 was developed within the constraints of the Bayer MS Tech Agreement.

## CONCLUSION

Because there is no genuine dispute that DAS is licensed under

the patents asserted by Bayer, the district court correctly granted DAS

summary judgment.   This Court should affirm.

Respectfully submitted,

/s/ Mark S. Davies
Mark S. Davies
Orrick, Herrington & Sutcliffe LLP
1152 15th Street N.W.
Washington, DC 20006
(202) 339-8400

*Attorney for Defendant-Appellee Dow
AgroSciences LLC*

# CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of March, 2014, I caused the nonconfidential version of the Answering Brief of Defendant-Appellee Dow AgroSciences LLC to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to all registered users.

_____/s/ Mark S. Davies_____

Mark S. Davies
*Attorney for Defendant-Appellee*
*Dow AgroSciences LLC*

## CERTIFICATE OF COMPLIANCE
## UNDER FEDERAL RULES OF APPELLATE PROCEDURE
## 32(A)(7) AND FEDERAL CIRCUIT RULE 32

Counsel for Defendant-Appellee certifies that the brief contained herein has a proportionally spaced 14-point typeface, and contains 13,960 words, based on the "Word Count" feature of Word 2007, including footnotes and endnotes. Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this word count does not include the words contained in the Certificate of Interest, Table of Contents, Table of Authorities, Abbreviations, and Statement of Related Cases.

Dated:     March 20, 2014            Respectfully submitted,

/s/ Mark S. Davies
Mark. S. Davies
*Attorney for Defendant-Appellee*
*Dow AgroSciences LLC*